Lisa A. MILLER, Administratrix of the Estate of Raymond Miller, Plaintiff,

v.

MECKLENBURG COUNTY; Former Sheriff of Mecklenburg County, John Kelly Wall, personally and in his official capacity as former Sheriff of Mecklenburg County; Amos Charles Pellerin, personally and in his official capacity as Sheriff's Deputy for Mecklenburg County; Eric D. Moore, personally and in his official capacity as Mecklenburg County Pre-Trial Release Counselor; and Richard Lee Blanks, personally and in his official capacity as Charlotte Police Officer, Defendants.

No. C-C-83-754-M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Feb. 6, 1985.

Lawrence U. Davidson, III, Davidson & Harvey, Charlotte, N.C., for plaintiff.

Jonathan E. Buchan, Charlotte, N.C., for Tex O'Neill.

James O. Cobb, Edward Hinson, Jr., Grant Smithson and Frank B. Aycock, III, Charlotte, N.C., for defendants.

## ORDER

McMILLAN, District Judge.

This case is now before the court on motions of the parties on both sides of the case to compel Tex O'Neill, reporter for the *Charlotte Observer*, to disclose the name of a confidential source of information relating to the death of Raymond Miller, and unpublished information on the same subject received from that source.

## I

## FACTS

This suit was brought by Lisa A. Miller, daughter and administratrix of the estate of Raymond Miller, deceased. The complaint alleges that on September 13, 1981, defendants, acting under color of state law, caused Raymond Miller's death, in violation of his constitutional rights and in violation of 42 U.S.C. § 1983.

The defendants are Mecklenburg County, North Carolina; C.W. Kidd, now Sheriff of Mecklenburg County, and several employees of the county as of September 13, 1981: John Kelly Wall, Sheriff in 1981 of Mecklenburg County; Charles Pellerin, Sheriff's deputy; Eric D. Moore, employee of the Mecklenburg County Pre-Trial Release Program; and Richard Lee Blanks, a police officer.

Raymond Miller was arrested on September 13, 1981, and was taken to the Mecklenburg County Jail. The complaint alleges that he was then beaten by defendants Pellerin, Moore, and Blanks. After the beating, defendant Pellerin allegedly applied a "carotid suppression hold" (a form of "choke hold" or strangulation hold) on Mr. Miller. Mr. Miller was found dead in the "drunk tank" shortly after being left there by police officers.

Plaintiff seeks damages from defendants for their participation, either through direct actions or failure to supervise others properly, in the alleged killing of Mr. Miller.

The defendants deny the charge of using a choke hold on Mr. Miller, causing his death. As yet, no identified person has admitted having seen the application of such a hold on Mr. Miller.

Tex O'Neill wrote several articles for the *Charlotte Observer* on the incident. In an article published on August 11, 1983, almost two years after the death, Mr. O'Neill revealed that while he was investigating the story, he met someone at the jail who provided him information on a confidential basis. The published article reports that the unidentified source told Mr. O'Neill that defendant Pellerin had applied a choke hold to Mr. Miller. The source said that he then saw Mr. Miller drop to the floor. The source is quoted in the article as telling Mr. O'Neill that:

[Pellerin] put a choke hold on him and released it. He dropped, striking his head on the floor.... Pellerin put a choke hold on him, the other [man] grabbed him by the feet, and they carried him to the jail cell. When he put that second choke hold on him, his eyes rolled. He was gone.

Tom Jackson, Miller's cell mate the night of the incident, told Mr. O'Neill the day following Mr. Miller's death that Mr. Miller had died a few minutes after being placed in the "drunk tank."

Mr. O'Neill was deposed by plaintiff on May 2, 1984. At that time, he refused to identify his undisclosed source for the article and explained that he had promised the source confidentiality in return for the information. The reporter also admitted that his source had identified someone else who was present when Mr. Pellerin allegedly applied the choke hold to Mr. Miller. Only

Mr. Pellerin was mentioned in the story by name. The reporter explained that he chose not to print the other name because he felt that there was less certainty about this other witness to the alleged choking. The reporter did not reveal the name because of his own editorial decision, not because of a promise made to the confidential source. At the deposition, Mr. O'Neill stated that the witness to the event was one of three or four people. Although he could not remember the name at that time, he felt that he had it written down somewhere. However, he refused to reveal the name of that witness, as well as the name of the source itself.

To date, no one has been able to discover the identity of the reporter's confidential source, despite investigations of the incident by the City of Charlotte Police Department and by the F.B.I. in conjunction with the State Bureau of Investigation (S.B.I.).

Two autopsies have been performed on Mr. Miller's body. The first one, made the day after his death, concluded that the cause of death was accidental, although it reported that "deep hemorrhages are observed in the right strap muscles and in the right carotid sheath...." After the controversy over Mr. Miller's death began, the body was exhumed and another autopsy was performed on December 30, 1983. The report concluded that the cause of death would remain classified as undetermined. The examining doctor found hemorrhaging of strap muscles on both the left and right sides. The report said that there were three possible causes of death. First, it is "certainly possible that the decedent could have been killed with a 'stranglehold' placed around his neck by another individual, and the hemorrhages in the neck would tend to substantiate such a cause of death." Other possible causes noted are (1) a possible fall causing subdural hemorrhage and (2) fatty liver due to chronic alcoholism.

Plaintiff filed a motion to compel the reporter to answer questions about the confidential source. All of the defendants have joined in the motion. A hearing was held on September 19, 1984. Mr. O'Neill, the reporter, was represented by counsel at this and all other proceedings.

At the hearing plaintiff introduced into evidence nine depositions of people who were at the jail on the night of Mr. Miller's death. None of the deponents admitted seeing a choke hold applied to Mr. Miller. Plaintiff also introduced reports of the investigations of the city police and the F.B.I. in conjunction with the S.B.I. These investigations had not discovered the identity of the reporter's confidential source. Finally, plaintiff showed that she had investigated both the duty log kept for that night and the "sign-in" log kept for visitors. Plaintiff interviewed or deposed the people listed on the duty log, but she discovered that the sign-in logs have apparently been lost due to water damage during storage.

Questioning at the hearing revealed that plaintiff had not deposed Steve Moore, who was the first police officer to discover Mr. Miller dead in the cell.

On the day of the hearing, defendants Wall and Mecklenburg County moved to compel Mr. O'Neill to reveal the name of the witness to the alleged choking incident given to the reporter without a promise of confidentiality to the undisclosed source.

The court deferred a decision on plaintiff's original motion so that plaintiff could depose Steve Moore and the parties could brief the issue of compelling the reporter to reveal the name of the witness given to him by the confidential source.

After Steve Moore was deposed and memoranda filed, another hearing was held on November 20, 1984. At that hearing, plaintiff introduced the deposition of Steve Moore, in which he denied having seen a choke hold applied to Mr. Miller. The defendants and plaintiff renewed their motions to compel the reporter to reveal both the confidential source and the name given to the reporter by the source of another witness to the incident. All parties joined in both motions.

## II

## REPORTER'S CLAIM OF A QUALIFIED PRIVILEGE

Tex O'Neill's refusal to answer questions at the deposition is based on his claim of a qualified privilege under the First Amendment not to reveal confidential sources or information obtained from such a source.

The seminal case on the qualified privilege is *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), in which the Supreme Court held in a 4–1–4 decision that a court could require a reporter to testify in a criminal case about a crime that he had *witnessed.* Justice Powell cast the deciding fifth vote in a concurrence which stressed the limited holding of the Court. The concurrence says the "asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg*, 408 U.S. at 710, 92 S.Ct. at 2671. Justice Powell explained that the proper balance must be struck on a case-by-case basis by balancing the interests of society in a free press on one hand and in a fair and complete trial on the other. His concurrence ended, "In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Id.*

The Supreme Court has never ruled, in a civil case dealing with the question of a qualified privilege of reporters, that reporters could not be forced to reveal confidential sources or material derived from such sources. In the absence of such direct rulings from the Supreme Court, six circuit courts relying upon or extrapolating from Justice Powell's language in *Branzburg*, have ruled or said that in a civil case, a party moving to compel a reporter's testimony must meet strict tests showing a *compelling need* for the information sought and an *inability to obtain the information elsewhere. Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir.1980); *Baker v. F & F Investment,* 470 F.2d 778 (2nd Cir.1972); *Riley v. City of Chester,* 612 F.2d 708 (3rd Cir.1979); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, *modified* 628 F.2d 932 (5th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977); *Zerilli v. Smith,* 656 F.2d 705 (D.C. Cir.1981).

No circuit which has squarely addressed the question of a qualified privilege has held that no such privilege exists. The Fourth Circuit has only faced the issue indirectly. In *United States v. Steelhammer,* 539 F.2d 373 (1976), *rev'd. en banc,* 561 F.2d 539 (4th Cir.1977), the Fourth Circuit, sitting *en banc* at a rehearing, upheld a finding of contempt against reporters who, although they were *witnesses* to the matter at trial, refused to testify. The court explicitly found that the newspaper reporters were *witnesses to the event* like other members of the public. The testimony sought from the reporters did not include any confidential information or material given to the reporters by another party. However, the court noted its approval of the dissent in the original panel decision, which had found the question moot, but had analyzed the case under the balancing approach suggested by *Branzburg.*

The case now before the court presents both the question whether this reporter should reveal a confidential *source* and the question whether he must reveal non-confidential, but unpublished, *information* supplied by that source.

Although there is not complete unanimity on the application of the qualified privilege to non-confidential information, the majority view clearly is that non-confidential material received by a reporter from an investigative source is protected by the qualified privilege. However, courts note that the lack of confidentiality will be a factor in the balancing of interests. *See, e.g., United States v. Blanton,* 534 F.Supp. 295 (S.D.Fla.1982); *Altemose Const. v. Bldg. and Const. Trades Council,* 443

F.Supp. 489 (E.D.Pa.1977); *Loadholtz v. Fields,* 389 F.Supp. 1299 (M.D.Fla.1975); *United States v. Cuthbertson,* 630 F.2d 139 (3rd Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Maughan v. N L Industries,* 524 F.Supp. 93 (D.D.C.1981); *Continental Cablevision v. Storer Broadcasting,* 583 F.Supp. 427 (E.D.Mo.1984). *But see Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505 (E.D.Va. 1976).

■ This court adopts the holdings of these other courts and recognizes a *qualified* privilege under the First Amendment for the reporter both against revealing the identity of confidential sources and against revealing material that is supplied to the reporter by such confidential source. The case law is in agreement on the existence of qualified privilege when the *identity* of a confidential source is sought. This court follows the majority opinion in holding that the privilege applies also to *information* received from that source. As stated in *Cuthbertson,* 630 F.2d at 147:

> We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes.

Limiting the qualified privilege to only confidential information would have a chilling effect on the press's ability to gather news and make editorial decisions. If no privilege covers the material received from confidential sources, litigants in a case of public notoriety could begin their discovery by subpoenaing and deposing reporters covering the story so long as no confidential information is involved. Without a qualified privilege covering such material, non-confidential material not published would be open to scrutiny by parties to a suit. Although the non-confidential nature of the material will be considered in the balancing of competing interests, the qualified privilege should still apply to such material.

■ Of course, the qualified privilege does not apply when the reporter is being questioned about an incident to which he or she may be a witness like any other member of the public. In such a case, there is no intrusion into newsgathering or the special functions of the press. *See e.g. Alexander v. Chicago Park Dist.,* 548 F.Supp. 277 (N.D.Ill.1982).

■ No one test has developed for balancing the interests of society in applying the qualified privilege. However, the courts have generally looked at the same factors in the analysis of the privilege. The primary inquiry has been whether or not the material sought from a reporter goes to the heart of the case, *i.e.,* whether there is a *compelling need* for the information. *Carey v. Hume,* 492 F.2d 631 (D.C. Cir.1974), *cert. denied,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). In order to overcome the qualified privilege, the moving party must show that the information is crucial to the case. It is not sufficient that the information is just relevant to the case.

■ Courts have also looked to see if the suit is of a frivolous nature. *Id.* If the suit itself is without merit, the fact that the material goes to the heart of that frivolous suit will not be enough to overcome the qualified privilege.

■ Another crucial factor scrutinized by the courts is whether the party moving for disclosure has exhausted other possible sources of the information before seeking to compel the material from the reporter. As stated in *Zerilli,* 656 F.2d at 713, the information "should be compelled ... [from a reporter] only after the litigant has shown that he has exhausted every reasonable alternative source of information." Compelling the information from a reporter is to be the last resort of the litigants.

■ A final factor is the *public's* interest in having the press free to investigate stories without being compelled to disclose the sources for the information. The public has a paramount interest in having a free flow of information, and this flow may be constricted when reporters are forced to disclose a confidential source or unpub-

lished material received from that source. The First Amendment protection against disclosure of the *name* of a confidential source is stronger than the protection against disclosure of non-confidential *information* revealed by that source. *See, e.g., Bruno & Stillman, Inc.*, 633 F.2d at 597.

## III

### APPLICATION OF THE QUALIFIED PRIVILEGE TO THIS CASE

■ It is clear that plaintiff has exhausted every reasonable alternative source for the information sought. Even before appearing in court for the first hearing, plaintiff had deposed the known possible witnesses to the incident. Plaintiff had also reviewed the results of other investigations of the alleged choking and attempted to investigate the sign-in logs kept for the jail on September 13, 1981. At the first hearing, counsel for Mr. O'Neill suggested that plaintiff had not deposed Steve Moore, who just *might* have witnessed part of the incident. Plaintiff promptly deposed Mr. Moore without discovering any lead to the information sought. At the second hearing, there was no suggestion of other avenues of investigation that plaintiff could pursue. The court cannot see that plaintiff has any alternative to requesting the information from the reporter. Plaintiff has reached a dead end after commendable efforts to obtain the material elsewhere.

There is no suggestion that the suit is frivolous. The autopsy performed on the exhumed body shows that application of a choke hold is one of the possible causes of death. The depositions introduced by plaintiff reveal a struggle between police officers and Mr. Miller. Finally, the newspaper reports cite Mr. O'Neill's undisclosed source as seeing a choke hold applied on Mr. Miller causing his unconsciousness, and possibly his death. Far from being a frivolous suit, this case presents a serious claim of deprivation of constitutional rights.

Another factor is the public's interest in having the reporter free to prepare stories without being forced to disclose his confidential sources or unpublished material. In this case, we have two distinct pieces of information sought from the reporter. Disclosure of the first, the *identity of the confidential source,* may have a great impact on the public's interest. Mr. O'Neill only obtained the source's information by a promise of confidentiality. The qualified privilege protecting confidential sources is strong. The public has a deep interest in the publication of stories given by confidential sources, which may be more difficult to obtain after a reporter is forced to reveal a confidential source. The other piece of information—the *name of the witness* revealed by the confidential source—is not covered by any promise of confidentiality. It has been withhled from published stories solely by Mr. O'Neill's decision not to print the name. Requiring the revelation of that name would implicate editorial decision making, but would not force the reporter to break a promise of confidentiality. The need for First Amendment protection against revealing this information is not as great as when a *confidential* source is to be identified. *See, e.g., Continental Cablevision, supra.*

Plaintiff has a compelling need for this material, which goes to the heart of the case. Plaintiff requests the name of the confidential source and the name of the witness revealed by that source. This information lies at the core of plaintiff's theory of the case. No one has openly admitted seeing the incident as alleged by plaintiff. However, the confidential source has given Mr. O'Neill a narrative that is substantially the same as plaintiff's allegations in the complaint. The confidential source, though unidentified, is the reported author of the only eyewitness account that supports plaintiff's allegations of a choking of Mr. Miller. The same is true of the name of the witness revealed by the confidential source. This is another person who, according to the source, witnessed the incident alleged by plaintiff. This witness

might give plaintiff another possible support for her allegations.

The court finds that plaintiff has a compelling need for the information sought. The names of the confidential source and witness not only *go to* the heart of plaintiff's case, they very well may *be* the heart of the case.

The defendants have also claimed their own compelling need for the information sought. Although it appears to the court that defendants have shown a compelling need, the court need not make a ruling as to that question. The court has found that plaintiff has a compelling need and will order that the reporter answer questions at a deposition about the identity of the witness to the alleged choking. Because of this disposition of the plaintiff's motion to compel, the court does not need to make a ruling on the defendants' own need for the information.

The court finds that with all due deference to the First Amendment, plaintiff has met her burden to overcome the qualified privilege of Mr. O'Neill as to the naming of the witness whom he chooses not to name. Plaintiff has shown that her suit is not frivolous, that the information goes to the heart of the case, and that she has exhausted alternative sources for the information. In balancing plaintiff's interests against the First Amendment interests, the court finds that plaintiff's need for the information is greater than the public's interest in not having material revealed that was not given under a promise of confidentiality, but that the reporter chose not to publish.

Ruling on the motion to compel Mr. O'Neill to reveal his confidential source is deferred until after he has given the name of the witness to the alleged choking and the parties have investigated this lead. Though it appears to the court that plaintiff has met her burden to show why the court should require the reporter to name the confidential *source*, it is possible that the parties' needs may be satisfied by revealing only the name of the *witness*. This lead might provide the parties with enough information to remove the compelling need for the name of the confidential source. The First Amendment interests require that the less drastic demand on the reporter be made first because there is a possibility that compliance will remove the need for further, more invasive demands.

## CONCLUSION

For the reasons given above, the court will order Tex O'Neill to review his records and answer questions at a deposition about the identity of the witness to the alleged choking incident provided to him by his confidential source. The parties may investigate this information and report to the court what they have found and whether there remains a need for the name of the confidential source. If such need still exists, the court will then rule on the motion to compel the name of the confidential source.

The court regrets the moderate expense and delay required by this two-step procedure. However, the First Amendment interests at stake are serious, and the reporter should be forced to reveal only what is necessary. The possibility that the parties can obtain the information needed without Mr. O'Neill's revelation of the confidential source justifies the extra burdens imposed by this order.

IT IS THEREFORE ORDERED:

1. That Tex O'Neill's objection at deposition to questions about the identity of the *witness* to the alleged choking is OVERRULED, and he shall answer questions about the witness at a deposition.

2. That the motion to compel the name of the confidential source is DEFERRED.

3. That the parties shall report to the court within thirty (30) days whether need still exists for the name of the confidential source.