**Patrick DILLON, Plaintiff,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

**No. C–89–4208–MHP.**

United States District Court, N.D. California.

Oct. 19, 1990.

---

County of San Francisco, Frank Jordan, Roger Battaglia, Christopher Cunnie.

## ORDER

PATEL, District Judge.

The plaintiff, Patrick Dillon, was arrested by San Francisco police officers on September 22, 1988. Plaintiff maintains that the arresting officers violated his constitutional rights by using excessive force in executing his arrest. While the plaintiff originally brought causes of action under the Civil Rights Act of 1864, 42 U.S.C. § 1983 and California tort law, plaintiff's counsel dismissed the state law claims at a hearing on September 28, 1990.

The parties are presently before this court on a motion to quash a subpoena served by plaintiff on Gerald McEowen, a cameraman who witnessed the arrest and alleged beating of Mr. Dillon. Having considered the papers submitted and the oral arguments of the parties, the court denies the motion to quash.

## BACKGROUND

This suit was initially brought by the plaintiff in state court. It was subsequently removed by the defendants to this court pursuant to 28 U.S.C. § 1441(b). The plaintiff's complaint stems from events which occurred on September 22, 1988, when Patrick Dillon was arrested by San Francisco Police Sergeant Roger Battaglia and Officer Christopher Cunnie. Officers Battaglia and Cunnie were named as defendants in the complaint, along with the City of San Francisco and San Francisco Police Chief Frank Jordan.[1]

In the early hours of September 22, 1988, Patrick Dillon's home in the Haight–Ashbury neighborhood of San Francisco caught fire. After being trapped in an enclosed yard area for some time, Mr. Dillon and his family were eventually rescued by firefighters. Mr. Dillon returned to the scene of the fire shortly after 7:00 A.M. to retrieve whatever family belongings re-

Tito Anthony Torres, Jorge Portugal L., San Francisco, Cal., for plaintiff.

Shaun G. Clarke, Deputy City Atty., Kimberly A. Reiley, Chief Trial Deputy, San Francisco, Cal., for defendants City &

---

1. The court subsequently granted summary judgment in favor of the City of San Francisco and Police Chief Jordan.

mained. After briefly inspecting his apartment, plaintiff left the severely damaged building and passed through an area which apparently was closed to the public for safety reasons.

While walking through the restricted zone, the plaintiff was approached by Sergeant Battaglia, who intended to either remove Mr. Dillon from the area or to advise him to leave. An altercation ensued between the plaintiff and Sergeant Battaglia. Mr. Dillon contends that he was grabbed from behind by Sergeant Battaglia and that Battaglia began punching him, despite the fact that Mr. Dillon allegedly offered to cooperate. The plaintiff claims that he was then hit on the head from behind by Officer Cunnie. Plaintiff alleges, and defendants concede, that Sergeant Battaglia struck Mr. Dillon in the face with a bullhorn. Defendants, however, contend that all actions taken by the officers were necessary to effect the arrest of the plaintiff and were in self-defense. The plaintiff was eventually handcuffed and taken to a local hospital for treatment of facial lacerations prior to booking at San Francisco County Jail.

Gerald McEowen is a cameraman employed by KRON–TV, Channel 4 of San Francisco. On the morning of September 22, 1988, Mr. McEowen was on assignment in the Haight–Ashbury neighborhood filming the aftermath of the fire. While there, he witnessed the alleged beating of the plaintiff by the defendant police officers. Mr. McEowen attempted to film the incident, but was unable to do so due to a mechanical problem with his video camera.

Plaintiff subpoenaed Mr. McEowen to testify as an eyewitness to the altercation. Counsel for Mr. McEowen and KRON–TV filed a motion to quash the subpoena on the grounds that compelling a cameraman to testify as to his personal observations in such a case would violate the first amendment of the United States Constitution, article I, section 2(b) of the California Constitution, and California Evidence Code § 1070.

This court heard oral argument on the motion to quash the subpoena on September 27, September 28 and October 1, 1990. At the September 28 hearing, plaintiff's counsel proffered that, in addition to testifying as an eyewitness, Mr. McEowen would testify that firefighters at the scene warned defendants Battaglia and Cunnie to stop beating the plaintiff because their actions were being videotaped and that, when the police officers failed to heed the warning, the firefighters intentionally prevented Mr. McEowen from videotaping by obstructing his view. Two of the witnesses scheduled to testify for the defense are firefighters who were at the scene of the incident.

## DISCUSSION

At the inception of this motion, this case involved Federal constitutional and state tort claims. Thus, the motion initially focused on the California shield law. The plaintiff subsequently voluntarily dismissed his state claims against the defendant, leaving his 42 U.S.C. § 1983 cause of action as the sole remaining claim in this case.

■ Counsel for Mr. McEowen contends that, despite the fact that this is now an action based entirely on a federal question, this court must still apply both federal and state law with regard to evidentiary privileges. In fact, it is essentially the state shield law that is urged by the subpoenaed party. Even after dismissal of the state claims, counsel continues to argue this position because there are no applicable federal statutes and federal authority on the issue is unclear. Counsel therefore maintains this court must look to article I, section 2(b) of the California Constitution and California Evidence Code § 1070 (commonly referred to as the California Shield Law) to determine whether Mr. McEowen enjoys a privilege exempting him from the duty to testify.

In determining the law of privilege to be followed in a federal question case, "the rule ultimately adopted, whatever its substance, is not state law but federal common law." *Lewis v. United States,* 517 F.2d 236, 237 (9th Cir.1975) (footnote omitted). Under Rule 501 of the Federal Rules of Evidence, the federal law of privilege ap-

plies in all cases except those in which state law supplies the rule of decision. "Thus, the federal courts do not recognize, in non-diversity cases, state-created privileges...." *United Liquor Co. v. Gard,* 88 F.R.D. 123, 125 (D.Ariz.1980).[2]

Because this is a federal question rather than a diversity case, the court must apply federal law and will not ordinarily recognize state-created privileges. Counsel's attempt to convince this court that state law must be applied because federal authority is ambiguous is unavailing. Indeed, in 1974 the California Legislature amended section 1070 of the California Evidence Code to its present form in response to *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), a decision in which the Supreme Court sharply limited the circumstances in which a newsperson might claim a privilege.[3] *Delaney v. Superior Court,* 50 Cal.3d 785, 796, 268 Cal. Rptr. 753, 789 P.2d 934 (1990). The language of article I, section 2(b) of the California Constitution, adopted by the voters of California in 1980, is virtually identical to California Evidence Code § 1070. Thus, the California shield law, rather than being a means of supplementing ambiguous federal law, was specifically designed to go beyond the outer limits of that law.

█ In examining federal authority concerning a newsperson's privilege, this court must begin with the seminal *Branzburg* decision. A majority of the *Branzburg* Court found that a newsperson enjoyed no first amendment privilege with regard to grand jury testimony. However, while Justice Powell concurred with the plurality opinion of the Court, he sided with the four dissenting Justices in recognizing the possibility of a limited privilege in certain circumstances. *Branzburg,* 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

A careful reading of Justice Powell's concurrence and the dissenting opinions in *Branzburg* makes it clear that a qualified privilege was recognized primarily out of concern for maintaining the confidentiality of a newsperson's sources and information. The dissenting opinion of Justice Stewart, with whom Justices Brennan and Marshall joined, recognizes "[t]he reporter's constitutional right to a confidential relationship with his source[.]" *Branzburg,* 408 U.S. at 725, 92 S.Ct. at 2671–72 (Stewart, J., dissenting). Justice Powell's concurrence acknowledges the possibility of a privilege where the information sought from the journalist bears only a tenuous relationship to the court proceedings or where the journalist has reason to believe her testimony would implicate confidential sources. *Id.* at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

In *Farr v. Pitchess,* 522 F.2d 464, 467 (9th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), the Ninth Circuit found that *Branzburg* recognized a partial first amendment shield for a journalist subjected to demands to divulge the source of confidentially secured information.[4] Courts ruling subsequent to *Farr* have reached differing conclusions as to

---

2. In support of its position, counsel for Mr. McEowen cites *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 89 F.R.D. 489 (C.D.Cal.1981), where the court observed in dicta that "even in cases in which all claims are based exclusively on federal law, federal courts, in 'moulding federal privileges under the common law development approach of Rule 501,' have traditionally sought guidance from existing state law." *Id.* at 492, quoting 10 J. Moore, *Moore's Federal Practice* § 501.08 (2d ed. 1976). However, *Los Angeles Memorial Coliseum* concerned a matter in which California law and federal common law claims were present and federal and state law coincided. *Id.* at 495. This case involves only a Federal constitutional claim, and federal and state law may be in conflict. Thus, *Los Angeles Memorial Coliseum* is not compelling here.

3. Justice White, in his plurality opinion for the *Branzburg* Court, observed that state legislatures were free to go beyond those protections provided newspersons by the first amendment and to fashion their own shield laws. *Branzburg,* 408 U.S. at 706, 92 S.Ct. at 2669. It appears that both the legislature and voters of California accepted this invitation.

4. Even though *Branzburg* involved testimony before a grand jury, the *Farr* court found that the reasoning employed by the five Justices who recognized a privilege for newspersons was broad enough to apply to civil as well as criminal proceedings. *Farr,* 522 F.2d at 467.

whether the first amendment privilege for journalists extends beyond confidential sources and information. Some courts have ruled that journalists enjoy no qualified immunity under the first amendment when confidentiality is not at stake. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597–98 (1st Cir.1980); *Gilbert v. Allied Chem. Corp.*, 411 F.Supp. 505, 511 (E.D.Va.1976). Other courts have extended the apparent limits of *Branzburg* to recognize a privilege in cases involving a journalist's non-confidential sources and resource materials. *See, e.g., United States v. Cuthbertson*, 630 F.2d 139, 147 (3rd Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Los Angeles Memorial Coliseum Comm'n*, 89 F.R.D. 489 (D.C.Cal.1981); *United States v. Markiewicz*, 732 F.Supp. 316, 319 (N.D.N.Y.1990).

This court need not resolve the conflict of authority in order to rule on the motion to quash. Mr. McEowen has not been asked to reveal any confidential sources or information, nor has he been requested to produce or discuss any resource materials. Instead, Mr. McEowen has been subpoenaed to testify regarding his personal observations as an eyewitness to the alleged beating of a citizen by two police officers. This court knows of no authority to support the proposition that such personal observations are privileged simply because the eyewitness is a journalist. Indeed, numerous courts have ruled that such observations are not privileged. *See, e.g., Alexander v. Chicago Park Dist.*, 548 F.Supp. 277 (N.D.Ill.1982) (in civil rights action,

journalist has no first amendment right not to testify at deposition concerning his personal observations); *Markiewicz*, 732 F.Supp. at 319; *Pinkard v. Johnson*, 118 F.R.D. 517, 521 (M.D.Ala.1987); *Miller v. Mecklenburg County*, 602 F.Supp. 675, 679 (W.D.N.C.1985); *In re Ziegler*, 550 F.Supp. 530, 532 (W.D.N.Y.1982).

In light of the above, this court rules that the personal observations of Mr. McEowen are not privileged under the first amendment.[5]

██ Moreover, even if this court were to go well beyond the bounds of *Branzburg* and its progeny and recognize a privilege for Mr. McEowen's personal observations, the privilege would still fall in light of the circumstances of this case. The application of *Branzburg* to non-grand jury cases requires "that the claimed first amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts and a balance struck to determine where lies the paramount interest." *Farr*, 522 F.2d at 468. "[T]he lack of a confidential source may be an important element in balancing the [party]'s need for the material sought against the interest of the journalist in preventing production in a particular case." *Cuthbertson*, 630 F.2d at 147. *See also Pinkard*, 118 F.R.D. at 521 ("Generally, the more confidential the information sought, the greater the First Amendment protection.").

If this court were to undertake the balancing test mandated by *Branzburg*, it would find several factors weighing in fa-

**5.** Counsel for Mr. McEowen, in his papers and argument before the court, makes much of the supposed possibility that requiring Mr. McEowen to testify will seriously damage the news gathering process by causing sources to mistrust him and refuse to cooperate with him. Were revelation of Mr. McEowen's confidential sources at issue, this court might well rule differently. However, the court doubts whether compelling Mr. McEowen to testify as to his personal observations, which did not come from sources, could in any way limit his ability to obtain information from sources in the future. Moreover, the fact that news gathering may be hampered in some way does not by itself create a constitutional privilege. As Justice White pointed out:

Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.

*Branzburg*, 408 U.S. at 684–85, 92 S.Ct. at 2658.

vor of enforcement of the subpoena. First, Mr. McEowen's testimony goes to the very heart of the plaintiff's claim that the defendant police officers violated his rights by beating him. Moreover, while other eyewitnesses have been called by the plaintiff to give testimony, none have been able to testify to supposed efforts by firefighters on the scene to prevent Mr. McEowen from filming the alleged beating. The proffer of plaintiff's counsel indicates that Mr. McEowen would testify concerning this alleged improper conduct, thus making his testimony especially relevant to the credibility of two firefighters on the scene who are scheduled to testify for the defense. Finally, the federal rights sought to be enforced here are substantial ones that rise to a constitutional level. All of these factors weigh in favor of enforcing the subpoena.

Weighing against enforcement of the subpoena is the journalist's qualified privilege under the first amendment. However, if any first amendment protection were to be afforded in this case, it would be greatly diminished by the fact that no confidential source or information is at stake.

In the balancing of the interests present on these facts, the scales tip sharply in favor of plaintiff's right to Mr. McEowen's evidence. Thus, were the court to recognize a qualified privilege for Mr. McEowen (which in fact it does not), it would find that, on balance, the surrounding facts weigh in favor of enforcement of the subpoena.

In this case, the "paramount interest" lies in determining whether Mr. Dillon's rights under the United States Constitution have been violated. Quashing the subpoena of Mr. McEowen would only detract from that goal without protecting any weighty first amendment interest.

In light of the above discussion, the motion to quash the subpoena of Mr. McEowen is DENIED.

IT IS SO ORDERED.