**STATE of Minnesota, Respondent,**

**v.**

**Steven Allen TURNER, Petitioner,**

**Northwest Publications, Inc., Respondent.**

**No. C5-95-2668.**

Supreme Court of Minnesota.

July 18, 1996.

Richard Coleman, Asst. Public Defender, W. St. Paul, Kelly Malone O'Neill, Asst. Public Defender, St. Paul, for Petitioner.

Paul Hannah, St. Paul, Heidi Westby and Danell Hill, Asst. Ramsey County Attys., St. Paul, for Respondent.

## OPINION

KEITH, Chief Justice.

This case raises the issue of whether a qualified reporter's privilege exists under the United States and Minnesota Constitutions which would protect a newspaper photographer from compelled testimony in a criminal case, or would protect a newspaper from the forced disclosure of unpublished photographs. In addition, we are asked to decide whether the Free Flow of Information Act, Minn.Stat. §§ 595.021–.025 (1994), protects newspaper photographers and newspapers from compelled disclosure of nonconfidential information, specifically eyewitness testimony and unpublished photographs. Petitioner Steven Allen Turner has obtained review of a court of appeals order denying his petition for a writ of prohibition, and argues that

Pioneer Press photographer Chris Polydoroff, an employee of Northwest Publications, must comply with Turner's subpoenas requesting Polydoroff's testimony and the disclosure of any unpublished photographs relating to Turner's arrest. We conclude that Polydoroff has neither a qualified constitutional privilege to refuse to testify in Turner's criminal case, nor does Northwest Publications have a similar privilege to refuse to disclose any unpublished photographs relevant to Turner's defense, and that the Free Flow of Information Act does not apply to the information sought by Turner from Polydoroff and Northwest Publications. Accordingly, we reverse the order of the court of appeals, and declare that the writ of prohibition shall issue to restrain the Ramsey County District Court from enforcing its order to quash Turner's subpoenas.

## I.

In the fall of 1995, the St. Paul Pioneer Press began a study of various efforts to control criminal activity in the Twin Cities area. In order to contribute to this news report, Pioneer Press photographer Chris Polydoroff accompanied two St. Paul police officers in their vehicle as they patrolled the St. Paul area on October 11, 1995. Polydoroff rode in the back seat of the squad car, separated from the officers by a plexiglass and wire shield.

Polydoroff was seated in the squad car when the police officers encountered petitioner, Steven Allen Turner. The Criminal Complaint and police reports filed in Ramsey County District Court state that when the police officers first observed Turner's vehicle, they believed that it was being driven by a person with an active felony warrant, named Trinis Edwards. The officers followed the vehicle and attempted to stop it by sounding the squad car siren, but the driver made evasive driving maneuvers. The officers eventually stopped the vehicle in a parking lot and apprehended the driver, who was later determined to be Turner (and thus not Edwards, the person with the felony warrant). Turner was in possession of three baggies of crack cocaine and was immediately arrested by the officers.

Polydoroff witnessed the initial encounter between the officers and Turner, as well as the alleged crime and subsequent arrest. Turner states that Polydoroff is "the only neutral disinterested third[-]party eyewitness" present throughout the entire incident. Polydoroff took several photos of what he observed, one of which (taken after the arrest) was published in the Pioneer Press on October 15, 1995. The published photograph shows a hand holding three rocks of crack cocaine with the caption: "Police seized [the cocaine pictured] from a man arrested last week at Laurel Avenue and Victoria Street in St. Paul. Officers followed his vehicle from Concordia Avenue near the Attucks Brooks Legion Post after witnessing what they thought was a drug sale."

The Ramsey County Public Defender's Office was appointed to represent Turner, who was arraigned on a controlled substance charge on October 13, 1995. Turner's defense attorney identified a possible Fourth Amendment issue arising out of Turner's arrest, and moved to suppress the evidence seized by the police officers on the grounds that the officers lacked a "particular and objective basis for the seizure," primarily because the officers thought Turner was someone else when they decided to stop him. In addition, Turner's defense attorney has asserted that one of the police officers who arrested Turner, Officer Pat Scott, "routinely stops people in violation of their constitutional rights, and stops them simply because he does not recognize them." This particular allegation is based upon a Pioneer Press news article published on November 26, 1995, describing Officer Scott's habit of stopping and questioning citizens whom he does not recognize. Turner's defense attorney claims that the information contained in this particular article is relevant to Turner's defense because it is evidence of the officer's habit or routine practice, as governed by Minn. R. Evid. 406.

On November 9, 1995, Turner subpoenaed Polydoroff to testify at the omnibus hearing scheduled for November 17, 1995. The subpoena requested the production of "all notes, records[,] photographs or recordings in your posses[s]ion or which you may have knowl-

edge of regarding contact with the police on or about October 11, 1995 or the arrest of [Turner]." On the day of the omnibus hearing, Turner served Polydoroff with a second, broader subpoena, requesting "all notes, records, photo[s] or recordings in your possession or which you may have knowledge of regarding the police officers on any other days in the 'lengthy study of crime.'" Northwest Publications moved to quash the subpoena, arguing that: (1) a qualified reporter's privilege exists under the federal and state constitutions to protect Polydoroff from compelled testimony, (2) the Free Flow of Information Act, Minn.Stat. §§ 595.021–.025 (1994), protects Polydoroff and the subpoenaed information, and (3) the subpoena was burdensome and oppressive.

At the omnibus hearing, Turner's defense attorney argued that the motion to quash the subpoenas should be denied. The district court judge responded that he did not see how Polydoroff's testimony and the unpublished photographs would be relevant to a probable cause issue, and in a December 15, 1995 order, the district court granted Northwest Publications' motion to quash the subpoenas. The court noted that Turner's attorney was unable "to state any relevance for either [Polydoroff's] testimony or photographs," and determined that the newspaper article at issue did not contain any indication of an unlawful arrest, search or seizure.

Turner then filed a petition for a writ of prohibition in the court of appeals. Turner asserted that it was impossible to show what specific testimony from Polydoroff would be relevant to Turner's defense because Polydoroff has refused to divulge any information under a claim of privilege. Turner stressed that Polydoroff was present at the scene of the arrest and witnessed the entire incident, and therefore should be required to testify in court like any other witness. Northwest Publications objected to Turner's petition on both procedural and substantive grounds, arguing that the writ of prohibition is an extraordinary remedy, reserved for extreme cases where no ordinary legal remedy exists, and that the district court's decision was correct because Turner had not overcome the qualified reporter's privilege, nor had Turner

satisfied the requirements of compelled disclosure under Minn.Stat. § 595.024 (1994). The court of appeals denied Turner's petition for a writ of prohibition on January 9, 1996, concluding that Turner had neither shown that the information sought from Northwest and Polydoroff was relevant to his defense, nor met the requirements of compelled disclosure in Minn.Stat. § 595.024.

## II.

██ Northwest Publications argues on appeal that a petition for a writ of prohibition is not an appropriate means by which to obtain review of the trial court's order, and that Turner's remedy is limited to direct appeal of the district court's order after trial. For a writ of prohibition to issue from an appellate court, the petitioner must meet three requirements: "(1) an inferior court or tribunal must be about to exercise judicial or quasi-judicial power; (2) the exercise of such power must be unauthorized by law; and (3) the exercise of such power must result in injury for which there is no adequate remedy." *Minneapolis Star & Tribune Co. v. Schumacher,* 392 N.W.2d 197, 208 (Minn. 1986) (citing *Wasmund v. Nunamaker,* 277 Minn. 52, 151 N.W.2d 577 (1967)). The writ will issue from the reviewing court "only in extreme cases where the law affords no other adequate remedy by motion, trial, appeal, certiorari, or otherwise." *Wasmund,* 277 Minn. at 54, 151 N.W.2d at 579.

██ Northwest Publications asserts that Turner has not met these requirements because the district court's decision was correct, and because other remedies, such as direct appeal following a conviction, are available to Turner. In general, this court has limited the availability of extraordinary relief to those cases where the lower court has exceeded its jurisdiction and no other adequate remedy exists. *See Wasmund, supra; Brooks Realty, Inc. v. Aetna Ins. Co.,* 268 Minn. 122, 128, 128 N.W.2d 151, 155 (1964). For example, a petition for a writ of prohibition is an appropriate means of obtaining review of a discovery order, which is not appealable as of right, where the district court has ordered the production of information clearly not discoverable. *Mampel v.*

*Eastern Heights State Bank of St. Paul,* 254 N.W.2d 375, 377 (Minn.1977).

Similarly, this court has issued a writ of prohibition to correct an error of law in the lower court where no other adequate remedy is available to the petitioner and enforcement of the trial court's order would result in irremediable harm. *See Mampel, supra; Ginsberg v. Williams,* 270 Minn. 474, 135 N.W.2d 213 (1965). For example, in *Brooks Realty,* this court reasoned:

The vice in our refusal to pass upon the question presented is that the pretrial decision here challenged would, in the normal course, only reach us upon an appeal following a trial of the remaining cases. It would not be consistent with the proper administration of justice for us to wait to correct the error of law committed herein upon multiple appeals from the trials of the remaining cases. Such relief could hardly be regarded as affording to relators an adequate remedy.

268 Minn. at 128, 128 N.W.2d at 155. Similar concerns are implicated by Turner's current petition: while Turner could contest the district court's order to quash the subpoenas after a conviction, this is not an adequate remedy when the district court's order may have denied Turner access to exculpatory evidence and testimony which arguably could assist him in his defense of the criminal charges.

We echoed this reasoning in a more recent case, *Minneapolis Star & Tribune Co. v. Schumacher,* in which news media representatives sought a writ of prohibition to prevent the enforcement of orders issued by a district court to seal several court files. 392 N.W.2d 197, 200 (Minn.1986). At the request of the litigants, the district court had ordered that its files in five wrongful death cases be sealed after stipulated settlements were reached. A reporter from the Minneapolis Star & Tribune sought access to the files and filed a motion to intervene. The district court granted the newspaper's motion to intervene, but refused to quash the original sealing order. The newspaper and other media representatives filed a petition for a writ of prohibition in the court of appeals, and the writ issued. *Id.* at 201. Even though the

Minneapolis Star & Tribune had a right to an ordinary appeal under the Rules of Civil Appellate Procedure, this court held that the newspaper had correctly employed the writ. *Id.* at 208. We further noted:

In addition, most cases involving questions of access are finally decided at an appellate level rather than at the trial court. Because a final decision on such questions is normally rendered only after an appellate proceeding, an expedited review is necessary in order to make the appellate court's decision something more than simply the answer to an issue that is moot or no longer relevant.

*Id.* Thus, while respondent in this case, Northwest Publications, is correct in asserting that the writ of prohibition procedure is an "extraordinary" remedy reserved for preventative rather than corrective needs, this court has permitted use of the writ in compelling situations, even where an "ordinary" appellate remedy arguably exists. Therefore, we conclude that the petition for a writ of prohibition is a proper means by which to challenge the trial court's interlocutory order quashing Turner's subpoenas.

### III.

The first substantive question we must consider is whether Polydoroff and his employer, Northwest Publications, possess a qualified constitutional privilege to refuse to comply with Turner's subpoenas under the First Amendment's guarantee of freedom of the press. In *Branzburg v. Hayes,* the United States Supreme Court held that reporters are not privileged to refuse to testify in a grand jury proceeding regarding the criminal conduct of their confidential news sources. 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The *Branzburg* decision involved reporters in three separate cases who had refused to testify before a state or federal grand jury on the grounds that the information they possessed, obtained through promises of confidentiality, was protected by the First Amendment and reporter shield laws. 408 U.S. at 668, 673, 676, 92 S.Ct. at 2650, 2652, 2654. The reporters claimed that they had a right to refuse to testify concerning confidential news sources because, if they

were forced to testify, "the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment." 408 U.S. at 679–80, 92 S.Ct. at 2656.

The Court rejected this argument, however, and refused to establish a qualified reporter's privilege. Justice White, writing for himself and three other justices, noted the "great weight of authority" that reporters are not excluded from the general duty of citizens to appear before a grand jury and answer questions relevant to an investigation. *Id.* at 685, 92 S.Ct. at 2658. Furthermore, "[a]t common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." *Id. See* 23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5426, at 716 n. 22 (1980) (no reporter's privilege existed at common law). Justice White observed that the only testimonial privilege for unofficial witnesses is the Fifth Amendment privilege against self-incrimination: "We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do." 408 U.S. at 690, 92 S.Ct. at 2661. The Court rejected the reporters' argument that the free flow of information to the public would be hampered by forcing reporters to testify in a criminal investigation because the Court found no conclusive or reliable evidence to support it. *Id.* at 693–94, 92 S.Ct. at 2662–63. The Court also stated that the public's interest in apprehending and prosecuting crimes reported to the press by informants outweighed any professed public interest in possible news about other crimes from confidential informants. *Id.* at 695, 92 S.Ct. at 2663.

Justice Powell concurred in the plurality's opinion, but wrote separately "to emphasize what seems to me to be the limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." 408 U.S. at 709, 92 S.Ct. at 2671 (Powell, J., concurring). Justice Powell explained that the plurality's opinion did not eviscerate a reporter's rights to be free from governmental harassment, and to move to quash a subpoena if the reporter believes that "the grand jury investigation is not being conducted in good faith." *Id.* at 710, 92 S.Ct. at 2671. We note that Justice Powell's concurrence has been cited by some courts and commentators as evidence that *Branzburg* did in fact create a reporter's privilege. *See* Wright & Graham, *supra,* at 746–47 (collecting cases). But we do not agree with such strained interpretations of what Justice Powell clearly intended as a concurring opinion, rather than a dissent.

Turner stresses that under the Supreme Court's holding in *Branzburg,* reporters have the same duty to testify in a criminal case as other citizens. As Justice Powell stated, "[t]he newsman witness, like all other witnesses, will have to appear; he will not be in a position to litigate at the threshold the State's very authority to subpoena him." 408 U.S. at 710 n. *, 92 S.Ct. at 2671 n. * (Powell, J., concurring). Turner points out that the court of appeals' reliance on *Branzburg* as support for its decision to deny Turner's petition for a writ of prohibition is misplaced: the Supreme Court did not adopt a "compelling need" test for unpublished information obtained by a reporter. In response, Northwest Publications asserts that the *Branzburg* decision is not applicable to this case because Polydoroff did not witness any events relevant to Turner's claims. "Polydoroff may have witnessed some conduct, but the relevance of the conduct is minimal. Polydoroff could not provide a fact finder with evidence which would prove or disprove the key issues in the case." Polydoroff's affidavit, however, does not state exactly what conduct or conversations he witnessed while seated in the squad car, so it is impossible for either party to speculate at this time as to whether his testimony would be helpful or relevant to Turner's case.

In a case very similar to Turner's current petition, the Minnesota Court of Appeals considered whether a reporter may refuse to

testify when subpoenaed in a criminal proceeding. In *State v. Knutson (Knutson I)*, the court of appeals held that the First Amendment did not afford such a privilege to a reporter who witnessed a criminal act. 523 N.W.2d 909, 913 (Minn.App.1994), *pet. for rev. denied* (Minn., January 13, 1995). In *Knutson I*, the state served a reporter for the Minnesota Daily with a subpoena requiring him to testify at Knutson's assault trial. *Id.* at 910–11. The reporter had witnessed a physical altercation between Knutson and another individual at a political rally, but the Daily moved to quash the subpoena, arguing that the reporter's testimony was privileged under the First Amendment. The court of appeals held that the First Amendment does not give a reporter a privilege not to testify simply because he observes an incident while working as a reporter. *Id.* at 913 (citing *In re Ziegler*, 550 F.Supp. 530, 532 (W.D.N.Y. 1982); *Dillon v. City of San Francisco*, 748 F.Supp. 722, 726 (N.D.Cal.1990); *Miller v. Mecklenburg County*, 602 F.Supp. 675, 679 (W.D.N.C.1985)).

And in 1995, the court of appeals released a second decision arising out of Knutson's prosecution. *State v. Knutson (Knutson II )*, 539 N.W.2d 254 (Minn.App.1995). Prior to Knutson's trial, the state served the editor of the Minnesota Daily with a subpoena requesting all unpublished photographs taken of the incident. After the district court ordered the editor of the Daily to produce the unpublished photographs for in camera review, the Daily appealed, arguing that the unpublished photos were protected by the Free Flow of Information Act, Minn.Stat. § 595.021–.025 (1994), and by the First Amendment. The court of appeals rejected both arguments, and upheld the district court's decision to review the Daily's unpublished photographs in camera, finding that the lower court's order was consistent with the rationale of many federal courts that had considered the question. *Id.* at 257.

■ We concur with the majority of courts that have not excused a reporter from testifying concerning events personally witnessed simply because the witness is a reporter. In *Branzburg*, the Court explicitly rejected the reporters' argument that the

government must make a preliminary showing of relevance or that the information is unavailable elsewhere before the reporter will be required to appear before the grand jury. 408 U.S. at 701, 92 S.Ct. at 2666. Since *Branzburg*, most courts considering the issue have agreed that the First Amendment does not protect a reporter from testifying about events personally witnessed. *United States v. Steelhammer*, 561 F.2d 539 (4th Cir.1977); *United States v. Criden*, 633 F.2d 346 (3rd Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *In re Ziegler*, 550 F.Supp. 530, 532 (W.D.N.Y.1982); *Dillon v. City of San Francisco*, 748 F.Supp. 722, 726 (N.D.Cal.1990); *Bell v. City of Des Moines*, 412 N.W.2d 585, 588 (Iowa 1987) (reporter cannot use qualified privilege to refuse to testify as an eyewitness). Accordingly, we reject Northwest Publication's argument that Polydoroff is privileged to refuse to testify concerning the events he observed on October 11, 1995.

■ In our view, the Supreme Court has declared that no qualified constitutional privilege exists under the First Amendment that would protect reporters from compelled testimony in a criminal case. Thus, Polydoroff cannot seek protection from Turner's subpoenas under the federal constitution. The question remains, however, whether the Minnesota Constitution offers broader protection to the news media than the federal provision. Article I, Section 3 of the Minnesota Constitution states: "The liberty of the press shall forever remain inviolate, and all persons may freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of such right." This court has once before refused to interpret this language to provide greater protection to reporters than the First Amendment, and we do so again today. *See Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn.1992) (declining to construe Minnesota's free speech provision to give greater protection than the federal version). Following the Supreme Court's reasoning in *Branzburg*, we do not see how requiring a news photographer to testify regarding events he personally witnessed during the pursuit and arrest of an alleged drug offender will infringe upon

our state constitution's guarantee of free speech and publication. Every citizen has a duty to appear and testify when subpoenaed as a witness in a criminal case, and we refuse to excuse an entire class of citizens, the news media, from such a civic duty. The inconvenience suffered by reporters and news photographers who are called to testify regarding criminal activity is no more compelling than the inconvenience suffered by any other citizen who must disrupt his or her daily activities to comply with a subpoena.

■ We recognize, however, that some courts have required a threshold showing of relevance, need and unavailability before a reporter will be forced to disclose nontestimonial, unpublished information (*i.e.*, written notes and photographs). *See Knutson II,* 539 N.W.2d at 258 (ordering in camera review of unpublished photos). We believe that concerns of overburdening the news media justify the implementation of an in camera procedure for reviewing unpublished information, including photographs, before forcing a news organization to disclose information in its possession to a litigant. If a litigant asserts that unpublished information or photographs possessed by a newspaper may be relevant to his or her case, in camera review by the district court is an appropriate means of balancing the defendant's need for evidence to support his or her claims against the public's interest in a free and independent press. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 1002 n. 15, 94 L.Ed.2d 40 (1987) (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)) (defendant seeking in camera review of confidential information must make a "plausible showing" that the information sought would be "both material and favorable to his defense"). *See also State v. Hummel,* 483 N.W.2d 68, 72 (Minn. 1992) (defendant's request for in camera review of mental health records was properly denied by district court due to defendant's failure to show how records could be relevant to his defense); *State v. Paradee,* 403 N.W.2d 640, 642 (Minn.1987) (in camera review of welfare department records ordered); *State v. Kutchara,* 350 N.W.2d 924, 926 (Minn.1984) (while privilege not to disclose past medical records must sometimes give way to defendant's right to confront his accusers, in camera review of medical records by district court did not reveal any relevant information). In accordance with this practice, the district court should perform an in camera review of all unpublished photographs of Turner and the police officers in the possession of Northwest Publications and only release those which would be relevant to Turner's defense theory, as defined by his attorneys.

### IV.

The second substantive issue raised by Turner's petition is the applicability of the Free Flow of Information Act to his subpoenas. The Free Flow of Information Act was passed by the legislature in 1973, the year following the *Branzburg* decision, and is codified at Minn.Stat. §§ 595.021–.025. Section 595.022 states the purpose of the Act:

> In order to protect the public interest and the free flow of information, the news media should have the benefit of a substantial privilege not to reveal sources of information or to disclose unpublished information. *To this end, the freedom of press requires protection of the confidential relationship between the news gatherer and the source of information. The purpose of sections 595.021 to 595.025 is to insure and perpetuate, consistent with the public interest, the confidential relationship between the news media and its sources.*

(Emphasis added.) In general, the Act protects journalists from the compelled disclosure of the identity of their sources or the disclosure of "any unpublished information procured by the person in the course of work or any of the person's notes, memoranda, recording tapes, film or other reportorial data *which would tend to identify the person or means through which the information was obtained.*" Minn.Stat. § 595.023 (1994) (emphasis added).

This general privilege to refuse to disclose certain information can only be overcome by clear and convincing evidence that:

> (1) there is probable cause to believe that the source has information clearly relevant

to a specific violation of the law other than a misdemeanor,

(2) that the information cannot be obtained by any alternative means or remedy less destructive of first amendment rights, and

(3) that there is a compelling and overriding interest requiring the disclosure of the information where the disclosure is necessary to prevent injustice.

Minn.Stat. § 595.024, subd. 2 (1994). The party seeking disclosure of the information must apply to the district court, and the court shall enter an order granting or denying the application, along with findings of fact. If the district court's order is appealed, "nondisclosure shall remain in full force and effect during the pendency of the appeal." Minn.Stat. § 595.024, subd. 3 (1994).

■ In this case, Northwest Publications argues that the Act prevents Turner from obtaining testimony from Polydoroff or unpublished photographs from the newspaper because he has failed to meet the requirements of sections 595.023 and 595.024. Northwest insists that the fact that Polydoroff personally witnessed Turner's arrest should not exclude his testimony and photographs from protection under the Act. Northwest also asserts that the Act applies to unpublished photographs and other background information, even if the information sought was not obtained from a confidential source. Turner responds that the Act does not protect the information described by the subpoenas because Polydoroff personally witnessed the events and therefore does not need to protect any confidential informant. We agree with Turner's interpretation.

The court of appeals has twice rejected the argument that the Act applies to reporters who personally witness crimes, and to unpublished, nonconfidential information possessed by a newspaper. In *Heaslip v. Freeman*, the court of appeals held that the Act did not give a newspaper a privilege to withhold unpublished photographs of an automobile accident from a litigant because the newspaper was not protecting confidential sources. 511 N.W.2d 21, 24 (Minn.App.1994), *pet. for rev. denied* (Minn., February 24, 1994). The court analyzed the language of the Act, and

concluded that section 595.023 did not apply to unpublished photographs that did not tend "to identify the person or means through which the information was obtained." Minn. Stat. § 595.023. Therefore, the court rejected the newspaper's argument that the Act prohibited three types of forced disclosures, namely: (1) the identity of the person through which information was obtained, (2) any unpublished information gathered by the newspaper, *and* (3) any notes, photographs, film, etc., that would identify a source of information. Instead, the court held that section 595.023 was intended to protect only two types of information: (1) the name or identity of a confidential source, and (2) any unpublished information *that would reveal the identity of a source. Id.* at 23. This conclusion was further supported by the legislative purpose and history of the Act, as evidenced by section 595.022 and the words of the bill's author, Senator Humphrey, at a Judiciary Committee hearing. *Id.* at 24.

The court of appeals reached a similar conclusion in the *Knutson* cases discussed above. In *Knutson I,* the Minnesota Daily argued that the Act prevented the district court from ordering its reporter to testify concerning the assault he witnessed. 523 N.W.2d at 912. The court, citing *Heaslip,* rejected this argument and concluded that the Act "does not apply where, as here, the unpublished information would not identify a source." *Id.* And finally, in *Knutson II,* the court of appeals reached a similar conclusion regarding the unpublished photographs sought by the state. The court reiterated its holding in *Heaslip* that the Act only protects unpublished material which would identify confidential sources. 539 N.W.2d at 257. Nonetheless, the court concluded that in camera review was the most appropriate means of balancing the newspaper's First Amendment interests against the state's need for documentary evidence relating to a crime, and it upheld the district court's order for production of the photographs. *Id.* (citing *Paradee; Kutchara, supra* ).

■ In conclusion, while this court has not yet considered the application of the Free Flow of Information Act to eyewitness testimony from reporters and unpublished

photographs, it is clear that the Act was a reaction to the *Branzburg* decision, and was intended to provide additional protection to reporters and their employers against subpoenas from litigating parties. Northwest argues that the Act applies to Turner's request in this case, and there is no exception to the Act "simply because someone calls that reporter a 'witness.'" Northwest has adopted the identical argument pressed by the newspaper in *Heaslip:* the Act protects the identity of any confidential source, plus all unpublished information however derived, plus any resource materials that would tend to identify a source. Most courts and commentators, however, have not interpreted similar laws to protect unpublished nonconfidential information and testimony from reporters who witness crimes. *See* Wright & Graham, *supra*, at 775 (Minnesota's privilege statute "appears to limit the extension [of the privilege] to information that would tend to identify the source."). For these reasons, we reject Northwest's position and decline to apply the Act to reporters who witness crimes or to unpublished, nonconfidential photographs. As the court of appeals reasoned in *Heaslip* and the *Knutson* cases, the Act was clearly intended to protect the confidential relationship which exists between a reporter and his or her sources of information. Such concerns of confidentiality, however, are not implicated by Turner's subpoenas, and the language of the Act is clearly inapplicable to this case.

The court of appeals' order denying the petition for a writ of prohibition is reversed. The writ shall issue to restrain the Ramsey County District Court from enforcing its order quashing Turner's subpoenas.

Writ of prohibition shall issue.