STATE of Minnesota, Respondent,

v.

Myon Demarlo BURRELL, Appellant.

No. A03–1293.

Supreme Court of Minnesota.

May 19, 2005.

Rehearing Denied June 20, 2005.

Office of the State Public Defender, Steven P. Russett, Minneapolis, for appellant.

Michael A. Hatch, Minnesota Attorney General, St. Paul, and Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

This appeal results from the death in 2002 of Tyesha Edwards, 11, who died from a stray bullet fired during an apparent gang feud. Two persons pleaded guilty in connection with the crime. A third, appellant Myon Demarlo Burrell, was found guilty of Tyesha's murder and the attempted murder of Timothy Oliver, the apparent target of the shooting.

Burrell, a minor when the shooting took place, claims that the district court committed prejudicial error when it (1) found his *Miranda* waiver valid even though the police lied to him and denied him access to speak to his mother despite repeated requests before and after receiving his *Miranda* warning, (2) denied his request to cross-examine the police officers who interrogated him about specific false statements they made to him during the interrogation, (3) prevented him from exercising his constitutional right to confront a witness against him by admitting a pretrial statement his mother made to police before she died, (4) permitted a psychiatrist to vouch for a prosecution witness's truthfulness, (5) admitted expert testimony about criminal gangs, (6) refused to admit testimony from jail inmates who purportedly heard a nontestifying codefendant confess to firing the fatal shot and state that Burrell had not been present at the shooting, (7) denied his request to compel the discovery of two codefendants' plea negotiations, and (8) imposed a sentence that constitutes an unsupported departure from the Minnesota Sentencing Guidelines' presumptive sentence. We conclude that several errors occurred during Burrell's trial, and therefore reverse and grant a new trial.

*The crime and investigation*

At around 3:00 p.m. on November 22, 2002, Tyesha Edwards was with her younger sister, Lakia, doing homework and watching television inside her South Minneapolis home when she was struck in the chest by a bullet. Lakia tried to call 911,

but the phone did not work, so she sought help from the next-door neighbors. Neighbor Tinicia Longs ran to the girls' home and found Tyesha on the dining room floor. Longs ran to get her phone and then, with her husband, returned to the girls' home, where she dialed 911. Longs and her husband attempted to comfort Tyesha until she lost consciousness. Tyesha was taken to Hennepin County Medical Center in Minneapolis, where she was pronounced dead.

The first officers on the scene found a bullet hole in the wall of the home, behind a dining room chair. Subsequent investigation revealed that the bullet was fired from outside the home and had traveled from southwest to northeast. Southwest of the home, officers found seven spent shell casings and a bullet lodged in the porch rail of another home. Two days later, Tyesha's parents found a bullet hole in Tyesha's bedroom wall and a bullet nearby.

After interviewing witnesses, police learned that a teenager named Timothy Oliver was linked to the crime. On November 25, 2002, Oliver called the lead investigator in the case, saying that he delayed coming forward because he was afraid that someone was trying to kill him. Later that afternoon, police detained Oliver in connection with a separate shooting. Investigators in Tyesha's case interviewed Oliver and showed him two photographic lineups, each containing photographs of six males of similar race and age. From the lineups, Oliver identified Hans Williams and Ike Tyson as being involved in Tyesha's shooting, but Oliver said that a 15– to 17–year–old male named "Skits" was the shooter.

Police officers subsequently learned that "Skits" was Myon Burrell, a 16–year–old who grew up in Minneapolis and had moved with his mother to Bemidji, Minnesota. Early on November 26, 2002, Oliver selected Burrell's photograph from a third photographic lineup.

Shortly before noon on November 26, the Minneapolis police arrested Burrell in South Minneapolis. Burrell was brought to a police department interrogation room, where a video camera recorded his meeting with police investigators. The interview videotape begins with Burrell alone in an interrogation room, seated with his hands handcuffed behind his back. After about eight minutes, a police officer opened the door, but did not say anything or immediately enter the room. Almost a minute later, Burrell said to the officer: "Sir, can I call my mom now please?" The officer responded that Burrell will "have to wait." Burrell answered in the affirmative when the officer asked whether he had been in trouble before. Burrell then said: "So I don't get to talk to my mom before I get to talk to (inaudible)?" The officer responded that Burrell would "have to talk to the investigator," and then left Burrell alone, still handcuffed.

Twelve minutes later, the lead police investigator on Tyesha's homicide entered the room with another investigator. They removed Burrell's handcuffs, introduced themselves, informed him that they were "looking at that little girl that got shot," and asked Burrell his age. Burrell responded that he was 16. The lead investigator then told Burrell that "last night we uh, we talked with Hans and Ike and those guys," and that "they're putting you in the middle of some stuff," and that "they're hooking you into this stuff." Burrell responded by stating that he did not "even mess with Ike or Hans." The investigator then indicated that Williams and Tyson were "helping themselves," and that Burrell needed to "take care of yourself so you can be there for your baby in a year, five

years, ten years." Shortly thereafter, the following exchange took place:

> Lead investigator: But um, uh first of all uh what we need to do uh first okay, I want, I want to hear your side of it okay?
>
> Burrell: Yeah.
>
> Lead investigator: And, and let me know if those guys are full of baloney or let me know if they hooked you into something you didn't want to be in, okay?
>
> Burrell: All right. (Inaudible)
>
> Lead investigator: Okay, okay, look—
>
> Burrell: What me being a juvenile interrogation, don't I get to um, can I call my mother cause (inaudible) supposed to be going (inaudible) at 12 o'clock.
>
> Lead investigator: Yeah have you ever been, have you ever been arrested in Minnesota before? Or hauled in in Minnesota, ever?

Burrell indicated that he had a misdemeanor arrest on his record. Then this exchange occurred:

> Lead investigator: Okay. In Minnesota what we're gonna do is uh, right here and right now, is we're gonna talk to you 'cause your mom wasn't with ya these last couple days. Ya know what I mean?
>
> Burrell: Yes, my mom (inaudible).

The investigator responded that "we'll go talk to her too," but that first Burrell was to be given an opportunity to "let us know your side." Seven more exchanges between the investigators and Burrell followed, and then the lead investigator mentioned the *Miranda* warning. The investigator then administered the *Miranda* warning, inquiring after each part to ensure that Burrell understood each of his rights. Burrell generally indicated comprehension, responding that he "[didn't] have to say anything if I don't want to,"

that "if I say anything you can bring it up in court," and that, if he could not afford an attorney, the attorney who would be provided to him is called a "public defender." After the warning was complete, Burrell was asked whether he understood "each of those rights." Burrell uttered something unintelligible and nodded his head up and down. The investigator then asked Burrell whether he wanted to "tell us your side."

Burrell responded that he "didn't know anything about what happened to that little girl or anything," and that he and his mother had arrived in the Twin Cities shortly after dark on Saturday, November 23—the day after Tyesha was shot. Burrell said he had slept at his brother's home on Saturday night, and early Sunday morning had taken a bus to the Mall of America in Bloomington, where he bought new clothes at about 6:45 a.m. and then saw a movie. About 30 minutes later, Burrell was informed that Mall of America stores are not open at 6:45 on a Sunday morning, that he was getting "caught up in your lies," and that he was under arrest for first-degree murder.

Burrell asked to speak with his mother 10 times after receiving his *Miranda* warning, and each time the request was denied. This exchange occurred a little over an hour into the interrogation:

> Lead investigator: And it was just you and your mom?
>
> Burrell: Can I talk to my mom now?
>
> Lead investigator: It was just you and your mom in the car?
>
> Burrell: It was just me and my mom. But can I talk to my mom now?
>
> Lead investigator: Um, not yet. Not yet. Uh, when we're finished here we'll let you talk to her.

During the interrogation, Burrell's mother, Marketta Burrell, had arrived at

the police station to inquire about the circumstances of his arrest. She was taken to a separate interrogation room where she told an investigator that she and her son lived in Bemidji and that a Bloods gang member who was a "bad influence" had been calling, urging Burrell to come to Minneapolis. She also told the investigator that her son's street name was "Skits," that she and Burrell had arrived in Minneapolis around 7:00 p.m. the previous Thursday—the day before Tyesha was shot—and that she did not know where her son was between Thursday evening and the following Monday. The record indicates that the conversation was recorded electronically, but that Marketta Burrell was not under arrest.

The investigator who had interviewed Marketta Burrell then resumed Myon Burrell's interrogation, informing Burrell that his mother, whom the investigator described as a "Christian lady [who] * * * wouldn't lie to me," said they had arrived in Minneapolis on Thursday, not Saturday. Burrell denied arriving on Thursday, but said "It was Friday or Saturday. Saturday or Friday, I don't know, I, I think it was Friday or Saturday." Soon thereafter, Burrell said: "It would have been on Friday or Saturday. Okay? * * * Was it on Thursday? Actually it was on Thursday."

After an additional 30 minutes of interrogation, Burrell said: "I really want to talk to my mom, you understand that?" The investigator replied: "Yeah, we'll, we'll arrange that." The interrogation resumed, and three minutes later this exchange took place:

Burrell: Can I go and get my phone call to my mom (inaudible)?

Investigator: We'll let you meet, we'll let you talk to your mom here.

Burrell: She's here?

Investigator: Yes.

Burrell: All right.

Investigator: We'll let you, we'll let you talk to your mom here, but I want to make sure that one thing.

Burrell: Hmm?

Investigator: That everything you said—

Burrell: Is truth.

Two minutes later, Burrell asked: "Can I talk to my mom and go?" The investigator did not directly respond to the request. Almost five minutes later, Burrell again asked, "Can I talk to my mom?" The investigator responded "yeah you can," and then told Burrell that "your mom's pissed at you" for "not following the right way." Less than a minute later, Burrell said: "I want to see my mom." The investigator replied with a question about whether Burrell smoked drugs. Thirty seconds later, this exchange took place:

Burrell: (Inaudible). What's up, can I go talk to my mom now?

Investigator: Yeah we're gonna get your mom. We're gonna get your mom. (Inaudible) And she's a nice lady.

Burrell: I know it.

Investigator: Yeah. And it's too bad you had to do her like this.

(Two minutes of interrogation passed.)

Burrell: So can I go talk to my mom then?

Investigator: We're going to bring her to you.

Burrell: Bring her to me. This is crazy. So when do I get to go to court?

Throughout the post-*Miranda* interrogation, the investigators continued to mention Williams and Tyson. Burrell was asked, "Why would Hans and uh, Ike say you were with them?" Burrell was also told that "we talked to Ike several hours last night. * * * He says uh, you were in the car with him and uh with Hans." La-

ter, an investigator asked: "Is it wrong if Ike's blamed it on you?" Burrell responded: "That's wrong." Throughout the interrogation, Burrell repeatedly denied riding in a car with Williams and Tyson on the day of the shooting.

The 2–hour, 57–minute videotape of the interrogation ended with the investigator promising to take Burrell to his mother. It is unclear from the record whether the investigator actually did take Burrell to see his mother. In all, Burrell asked for his mother 13 times—3 times before the *Miranda* warning and 10 times afterward. He never asked for an attorney.

The next day, a criminal complaint was issued that collectively listed Burrell, Tyson, and Williams as codefendants. According to the complaint, Williams told police officers that (1) he had remained in the car after he, Tyson, and "another individual" drove to where they believed Oliver was located; (2) he had heard several gunshots; and (3) he had observed "Tyson and the third codefendant * * * walking very fast" back toward the car as Tyson held a handgun. Tyson admitted to being in a car with the other codefendants and that a "verbal exchange" with Oliver had taken place, but that "[d]efendant Tyson claims nothing happened beyond that." But the complaint also indicates that Tyson "stated he shot the gun several times." The complaint does not specify that either Tyson or Williams identified Burrell by name as being the third codefendant.

On December 19, 2002, a Hennepin County grand jury indicted Burrell, Williams, and Tyson for first-degree murder for Tyesha' death and for the attempted first-degree murder of Oliver. Minn. Stat. §§ 609.185(a)(1), 609.05, 609.17 (2004). All three also were indicted for committing crimes for the benefit of a gang and committing crimes during a drive-by shooting. Minn.Stat. §§ 609.229,

609.185(a)(3) (2004). Tyson pleaded guilty to second-degree murder committed for the benefit of a gang and attempted first-degree murder for the benefit of a gang. During his plea hearing, Tyson testified that Oliver was the intended target, that Burrell was the shooter, and that any statements he previously made to the contrary were untrue. Tyson said he understood that the state could "withdraw this plea" if Tyson "were to attempt to provide false testimony" in the future.

*Pretrial motions*

During a pretrial hearing, Burrell claimed that his *Miranda* warning was insufficient and his *Miranda* waiver was ineffective, in part because he was denied access to his mother. After viewing the videotaped interrogation and hearing testimony from two of the interrogating investigators on the videotape, the district court ruled that Burrell generally demonstrated comprehension of the *Miranda* warning, that he had made a knowing and intelligent waiver of his *Miranda* rights, and that he gave his statements freely and voluntarily. The court stated that "there is no constitutional right for an underage Defendant to speak with his mother. The fact that the officer did not allow him to contact a parent does not affect the admissibility of the statement."

Marketta Burrell was unavailable to testify because she had died in a traffic accident on the day before Burrell was indicted. The district court denied Burrell's pretrial motion to suppress Marketta Burrell's police station statements on the ground that the totality of the circumstances indicated the statements were trustworthy. The court also denied Burrell's request for disclosure of Tyson's and Williams' plea negotiations and the testimony of their attorneys on the grounds that the negotiations would be inadmissible

evidence and disclosure of the negotiations would violate the attorney-client privilege.

The state sought to exclude testimony from Tyson's fellow inmates and a jail visitor who purportedly heard Tyson admit to being the shooter and say that Burrell was not involved. The court reserved ruling on the request, and made admission of this testimony contingent on Burrell establishing "sufficient indicia of reliability and a recognized exception to the prohibition of the admission of hearsay evidence." Ultimately, the court concluded that indicia of reliability were not proven, and did not allow the proffered jail witnesses to testify.

*Trial*

Testimony in Burrell's jury trial began on April 28, 2003. Among the eyewitnesses who testified, Oliver was the only one to state that Burrell, whom he identified as "Little Skits," was involved in the shooting.[1] Oliver testified that he and some individuals who belonged to various gangs were outside his aunt's house on Chicago Avenue South when he saw Bloods member Tyson drive up in a maroon Chevrolet Malibu, with "Little Skits" reclined in the front passenger seat. Oliver also testified that he and his gang rivals "mean mugg[ed]" each other—a gang reference, he said, for exchanging angry looks. The Malibu then sped away.

Oliver testified that soon he heard nine or ten gunshots from across Chicago Avenue. Oliver said he ran to the side of his aunt's house and saw "Little Skits" pointing a gun at him and pulling the trigger, but that no shots were fired because the gun had "no more shells in it." Oliver said he left the scene to avoid "the hassle of questioning."

The jurors viewed the videotape of Burrell's interrogation in its entirety. Burrell did not object to the videotape's admission. Burrell sought to cross-examine the investigators on specific mischaracterizations they had made during the interrogation before and after the *Miranda* warning was given. These mischaracterizations included the assertion that both Tyson and Williams had identified Burrell as being involved when in fact Williams had not identified Burrell by name and may not have known Burrell. The district court denied Burrell's request to have the investigators specify what statements were false, and only permitted Burrell to cross-examine the investigators generally about the use of false information during the interrogation.[2]

James Turner, who had been in a jail cell adjacent to Burrell's, testified that Burrell had admitted to being the shooter and that a burgundy car had been used. Turner said Burrell characterized the shooting as a "planned out hit" against a rival gang member, but that a bullet intended for their target had entered Tyesha's home. On cross-examination, Turner

---

1. Timothy Oliver died on January 28, 2004. The state sought to make a newspaper story containing details of Oliver's death part of the record on appeal. Burrell moved to strike the news article as being outside the record. *See* Minn. R. Civ.App. P. 110.01. By Order of May 28, 2004, we granted Burrell's motion to strike the article. Accordingly, in this appeal we did not consider the news article or any facts surrounding Oliver's death.

2. The case's lead investigator was asked: "Some of those things were not true, correct?" The investigator replied: "Some of them were not true." Later, the investigator who resumed Burrell's interrogation after interviewing Marketta Burrell was asked: "[I]n this interview, you said some things that were not true to try to get a reaction out of Mr. Burrell, correct?" The investigator replied: "I believe once or twice—I recall one time, yeah. * * * [This was] in regard to people that had seen him at the scene."

admitted to being paranoid schizophrenic and that "sometimes I hear voices."

The state called forensic psychiatrist Karen Bruggemeyer, who had examined Turner, to offer an expert opinion on whether anything about Turner's mental state affected his ability to receive, recall, and relay information, and whether Turner may have been hearing voices. Bruggemeyer answered in the negative. On cross-examination, Bruggemeyer was asked whether Turner "would be capable of" confusing Burrell's jailhouse comments. Bruggemeyer responded: "It's possible." On redirect, the state asked: "Well, Dr. Bruggemeyer, in your professional opinion, to a reasonable medical certainty did you believe James Turner to have made up any of this information he provided to the police?" Burrell objected based on foundation, relevance, and speculation. The objection was overruled, and Bruggemeyer responded: "I believe he was being truthful."

Marketta Burrell could not testify because she had died before trial. Therefore, the investigator who interviewed her testified as to what she had said at the police station about Burrell's arrival in Minneapolis the day before the shooting and his gang connections. No tape of the interview with Marketta Burrell was played for the jury. A member of the Minnesota Gang Strike Force then gave expert testimony about the ten-point list of criteria that Minnesota police use to gauge gang membership. The officer concluded that Burrell "is a Vice Lord that turned Blood."

The state called Burrell's cousin, Esque Madonna Dickerson, who had spoken with Burrell by phone after the shooting and after Burrell's arrest and then told her boyfriend, Hennepin County Jail inmate George Canady, about the conversation. The Dickerson–Canady conversation had been recorded and Dickerson was confronted with the transcript of the phone conversation details during trial. Dickerson testified that Burrell had admitted to riding with Williams and Tyson when Tyesha was shot.

Burrell did not testify, nor did Williams or Tyson. James Graham, a former Bloods member, testified on Burrell's behalf and said that Burrell was among some kids who played dominoes and video games at his home from a little after 2:00 p.m. until after 5:00 p.m. on the afternoon of the shooting. Burrell also called private investigator Michael Grostyan to testify about an anonymous tip that Grostyan had received regarding another possible suspect in the Tyesha case, but the court excluded Grostyan's testimony as not sufficiently reliable.

After the state and Burrell had rested, but before the district court instructed the jury, Burrell's attorney and the state placed on the record conversations between the court and counsel that had taken place during trial regarding Burrell's request to cross-examine the officers who Burrell claimed had made false statements during interrogation. The state referred to the court's apparent concern about "opening the door to the out-of-court statements of the co-defendants." The jurors were then instructed as follows: "The questions and statements of officers during Mr. Burrell's interrogation, which you viewed on videotape, are not evidence. You must not consider their statements in your deliberations and you may not use them in reaching your verdict."

The jury found Burrell guilty of all charges. The district court convicted Burrell on first-degree murder for the benefit of a gang and first-degree attempted murder for the benefit of a gang. Minn.Stat. §§ 609.17, 609.185(a)(1), 609.229 (2004). On June 10, 2003, the district court sen-

tenced Burrell to life in prison for first-degree murder, 15 years for attempted murder, and 12–month and 6–month terms, respectively, for committing crimes for the benefit of a gang—all to run consecutively.

The issues raised on appeal are whether the district court erred in (1) finding Burrell's *Miranda* waiver valid even though he had repeatedly asked to speak with his mother before receiving his *Miranda* rights, (2) denying Burrell's request to be able to cross-examine the police officers who interrogated him on the specific false statements they made during the interrogation, (3) preventing Burrell from exercising his constitutional right to confront a witness against him by admitting a statement his mother made to police before she died, (4) permitting a psychiatrist to vouch for a prosecution witness's truthfulness, (5) admitting expert testimony about criminal gangs, (6) refusing to admit testimony from jail inmates who purportedly heard a codefendant confess to firing the fatal shot, (7) denying Burrell's request to compel the discovery of two codefendants' plea negotiations, and (8) imposing a sentence that constituted an unsupported departure from the Minnesota Sentencing Guidelines' presumptive sentence.

### I.

We first consider Burrell's arguments regarding the adequacy of his *Miranda* warning and effectiveness of his waiver. Burrell contends that his *Miranda* warning was inadequate because he was not advised that his responses could be used in an adult-court prosecution. He also contends that his *Miranda* waiver was ineffective, in part because the police denied his repeated requests to speak with his mother and during his interrogation the police mischaracterized evidence they had against him.

■■■ We review findings of fact surrounding a purported *Miranda* waiver for clear error, and we review legal conclusions based on those facts de novo to determine whether the state has shown by a fair preponderance of the evidence that the suspect's waiver was knowing, intelligent, and voluntary. *State v. Ray,* 659 N.W.2d 736, 742 (Minn.2003); *State v. Hannon,* 636 N.W.2d 796, 806 (Minn.2001), *reh'g denied* (Minn. Jan. 14, 2002). When an appellant contends that credible evidence supports a finding that his *Miranda* waiver was ineffective, "an appellate court will make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was valid. Despite this inquiry, the standard of review remains whether the district court's finding is clearly erroneous." *State v. Camacho,* 561 N.W.2d 160, 169 (Minn.1997) (internal citation omitted).

### 1. Advice of adult court prosecution

In *Miranda v. Arizona,* the United States Supreme Court held that a criminal suspect facing interrogation must be informed that he has a right to remain silent, that anything he says can be used in court, that he has a right to consult with an attorney and to have the attorney present during interrogation, and that, if indigent, an attorney will be appointed to represent him. 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A suspect may waive his rights, as long as he does so voluntarily, knowingly, and intelligently. *Id.* at 444, 86 S.Ct. 1602.

■■■ When a juvenile is interrogated in connection with a crime that might be prosecuted outside of juvenile court, there is heightened concern that the juvenile understands that any inculpatory statements he makes after waiving his *Miranda* rights can be used against him in adult court. *State v. Loyd,* 297 Minn. 442,

445, 212 N.W.2d 671, 674 (1973). We have stated that the best course is to specifically warn the minor that his statement can be used in adult court, particularly when the juvenile might be misled by the "protective, nonadversary" environment that juvenile court fosters. *Id.* at 449–50, 212 N.W.2d at 676–77.

When investigators do not specifically warn a juvenile of possible adult prosecution, a *Miranda* waiver still may be effective because "[a]wareness of potential criminal responsibility may often be imputed to a juvenile when the police are conducting the interrogation." *Id.* at 450, 86 S.Ct. 1602 212 N.W.2d at 677. To determine whether adult court prosecution may be imputed to a juvenile, we examine several factors including the circumstances of the juvenile's arrest and the discussions that preceded administration of the *Miranda* rights. *See State v. Ouk*, 516 N.W.2d 180, 185 (Minn.1994). In *Ouk*, we held that criminal responsibility could be imputed to a 15–year–old defendant whose home had been surrounded by more than two dozen armed police officers, who was told during two hours of negotiations that he was a suspect in a shooting and robbery, who was handcuffed upon arrest, and who was taken directly to a homicide unit conference room. *Id.* In *State v. Williams*, we held that a juvenile could reasonably anticipate adult prosecution because "several police squad cars surrounded the car using highly adversarial felony arrest maneuvers," and the juvenile was told that police were investigating a double homicide. 535 N.W.2d 277, 287 (Minn. 1995).

In Burrell's case, the videotape of his interrogation made pursuant to *State v.*

*Scales*, 518 N.W.2d 587 (Minn.1994), indicates that Burrell was handcuffed upon entering a police department interrogation room. Before any *Miranda* warning was administered, an investigator told Burrell that "we're looking at that little girl that got shot" and asked Burrell some questions. Burrell was then given his *Miranda* rights. Burrell was then asked whether he wanted to tell his "side," and he responded: "I didn't know anything about what happened to that little girl or anything." Based on the physical restraints used during Burrell's arrest and the conversations indicating that Burrell knew that police officers had apprehended him in connection with Tyesha's killing, we conclude that knowledge of possible adult court prosecution could be imputed to Burrell.

2. Totality of the circumstances surrounding waiver

Even though we conclude that Burrell's *Miranda* warning was adequate, in this situation we must make a subjective factual inquiry as to whether the district court erred by concluding that the state has proven that Burrell's waiver was valid. *Camacho*, 561 N.W.2d at 168–69. For a *Miranda* waiver to be valid, all suspects regardless of their age must fully understand their rights, including the right against self-incrimination that is guaranteed by both the Fifth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution.[3] *See id. Miranda's* due process protections generally apply to juveniles, even those prosecuted in juvenile court. *See In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). When a juvenile's *Miranda* waiver is at issue, we examine

---

**3.** "No person shall be * * * compelled in any criminal case to be a witness against himself

* * * " Minn. Const. art. I, § 7.

the totality of the circumstances to determine whether the suspect understood his rights and the consequences that may arise if he waives them. *Ouk*, 516 N.W.2d at 184–85. The Supreme Court endorsed this approach in *Fare v. Michael C.*, saying:

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

In *Fare*, the Supreme Court refused a juvenile suspect's attempt to equate his request for a probation officer with a request for an attorney. The Court reasoned that a probation officer is not poised to offer legal assistance, and "is not necessary, in the way an attorney is, for the protection of the legal rights of the accused[.]" *Id.* at 722, 99 S.Ct. 2560. The Court noted, arguably in dicta, that under the totality of the circumstances approach, a juvenile's requests for a parent's presence could lead to a different result: "Where the age and experience of a juvenile indicate that his request for his probation officer or *his parents* is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination." *Id.* at 725, 99 S.Ct. 2560 (emphasis added).

Six years before *Fare*, in *State v. Hogan*, we had also rejected a per se rule requiring parental presence during a juvenile's interrogation, and instead adopted a totality of the circumstances test. 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973). The 15–year–old defendant, who was suspected of committing two downtown Saint Paul bombings, spoke voluntarily with police while in the hospital and after receiving his *Miranda* rights. *Id.* at 432–33, 441, 212 N.W.2d at 666–67, 671. He claimed he was a victim, but then declined to proceed without an attorney. *Id.* at 432, 212 N.W.2d at 666. However, after being told that he was under arrest, the juvenile made an inculpatory remark that was not in response to a police officer's question, which was admitted at trial. *Id.* at 441, 212 N.W.2d at 671. In that case, there was no indication that the juvenile had asked to speak with a parent before volunteering the inculpatory remark. *See id.* at 432–33, 212 N.W.2d at 666–67. We upheld the admission of the statement noting that the juvenile's "complete willingness, indeed determination, to establish his largely exculpatory story about being a victim of the bombing demonstrates that, considering the entire circumstances of his statements, he voluntarily told the story." *Id.* at 441, 212 N.W.2d at 671.

*Hogan* is relevant to our present analysis not only because we rejected a per se rule requiring parental presence, but also because of how this case fits into ongoing efforts in Minnesota and nationwide to determine when juveniles should have a parent present when waiving *Miranda* rights.[4] *Hogan* was decided at a time

---

4. A minority of states have enacted per se rules requiring parental presence, with some of those subsequently rejecting the per se rules. Barry C. Feld, *Criminalizing Juvenile Justice: Rules of Procedure for the Juvenile Court*, 69 Minn. L.Rev. 141, 177–80 (1984) (noting that Georgia, Indiana, Louisiana, and Pennsylvania are among states that have experimented with per se rules and that a few other states equate a juvenile's request for a parent with a request for an attorney); Note, *The Court Giveth and the Court Taketh Away:*

when all Minnesota counties except Hennepin and Ramsey had a Rule of Juvenile–Probate Procedure forbidding children from being interrogated without a parent being present. Minn. R. Juv.-Probate P. 2–2(1), Foreword at 615 (West deskbook 1982).[5] If this rule was violated in a delinquency action or traffic offense, any evidence from the interrogation was inadmissible. *Id.*, Rule 2–2(2). At that time, the Rules of Juvenile–Probate Procedure were adopted by county probate judges who had jurisdiction over juvenile proceedings; thus, these rules did not apply in Hennepin and Ramsey Counties where the district court had jurisdiction over juvenile proceedings. *Id.*, Foreword at 615; 13 Robert Scott & John O. Sonsteng, *Minnesota Practice—Juvenile Law & Practice IX* (3d ed.2002). In *Hogan*, we rejected the juvenile's argument that he was denied constitutional equal protection because the per se rule did not apply in Ramsey County. 297 Minn. at 439–40, 212 N.W.2d at 670.

The uniform Rules of Procedure for Juvenile Court, which took effect statewide after court consolidation in 1983, contained no required parental presence provision, but did require a child subject to interrogation to be advised of his constitutional rights. Minn. R. Juv. P. 6.01, subd. 1 (West deskbook Supp.1983). Rule 6.01, subdivision 2, specified that the "totality of the circumstances" surrounding any waiver of the right to remain silent or the right

to an attorney includes "the presence and competence of the child's parent(s) or guardian * * *." *Id.*, subd. 2. The present rules, renamed the Rules of Juvenile Delinquency Procedure in 2004, contain no specific provision addressing a juvenile's rights when the juvenile is interrogated. The Rules, however, require that a court holding a detention hearing must advise the juvenile of the right to remain silent. Minn. R. Juv. Delinq. P. 5.07, subd. 3(E) (West deskbook 2004). In addition, Minnesota Statutes require that a parent, guardian, or custodian of a child taken into custody be notified "as soon as possible" of the detention. Minn.Stat. § 260B.176, subd. 1 (2004).

■ Juveniles such as Burrell, who are 16 years old or older when accused of committing a felony while using a firearm, presumptively are certified for adult court prosecution. Minn.Stat. § 260B.125, subd. 3 (2004). But even then, courts must closely examine under the totality of the circumstances whether the juvenile is able to make a valid *Miranda* waiver without a parent's presence. In *State v. Jones*, we applied the test that we adopted in *Hogan* and held that a juvenile's request to speak with a parent after an interrogation had ceased did not trigger the right to counsel or the right to remain silent in two subsequent interrogations. 566 N.W.2d 317, 320–21, 324–25 (Minn.1997). In *Williams*, we held that a 16–year–old's *Miranda*

*State v. Fernandez—Returning Louisiana's Children to an Adult Standard*, 60 La. L.Rev. 605, 614–15 n. 81 (2000) (listing 13 states that have at some point adopted per se rules).

**5.** Rule 2–2(1) read in relevant part:

The right to remain silent shall include the right of the child in custody not to be interrogated by a representative of the state except in the presence of at least one of his parents and the right of the child to be

informed, in the presence of at least one of his parents:

(a) that the child has a right to remain silent; and

(b) that any statement made by the child might be used in a juvenile court cause against him or his parent; and

(c) of the child's right to counsel as set forth [in these rules]; and

(d) that the child has a right to consult with counsel prior to the making of any statement.

waiver was knowing, intelligent, and voluntary even though he was not advised that he could have a parent or guardian present during questioning. 535 N.W.2d at 282, 288. We noted that after the warning was administered, the juvenile had told the investigators that his mother had kicked him out of the house, that he did not know her phone number, that he had been staying with friends, and that he had not seen his father for a long time. *Id.* at 280. In addition, at no time during two hours of questioning did the juvenile request to speak with a parent or guardian. *Id.* at 282.

■ The circumstances of Burrell's purported *Miranda* waiver can be distinguished from *Jones* and *Williams* and again show why a district court must scrutinize the totality of the circumstances closely.[6] In this situation, the district court made findings of fact as to how Burrell's request for a parent affected the "admissibility of the statement," but did not make specific findings as to how the request may have rendered his *Miranda* waiver ineffective. Accordingly, we make a subjective factual inquiry. *See Camacho*, 561 N.W.2d at 168 ("if there is other evidence indicating that the waiver was not knowing, voluntary, and intelligent, the district court must make a subjective factual inquiry to determine whether, under the totality of the circumstances, the waiver was knowing, voluntary, and intelligent"). Unlike in *Jones*, the first words that Burrell uttered during the videotaped interrogation were: "Sir, can I call my mom now please?" He asked for his mother two more times before receiving his *Miranda* warning, and asked for her ten more times after receiving the *Miranda* advisory. Unlike the defendant in *Williams*, Burrell was not estranged from his mother. The record indicates that while Burrell had grown up in Minneapolis, his mother moved with him to Bemidji so that he would be shielded from gang-related influences. Burrell appeared to have had a close relationship with his mother, evidenced by the compliments that he paid to her during his interrogation. The police officers should have realized that by making repeated requests for a trusted and respected parent, Burrell desired his mother's counsel before waiving his *Miranda* rights, as well as afterward.[7]

■ Burrell's request for a parent is just one circumstance surrounding his purported *Miranda* waiver. Other factors include the juvenile's age, maturity, intelligence, education, physical deprivations, prior criminal experience, length and legality of detention, lack of or adequacy of warnings, and the nature of the interrogation.[8] *Williams*, 535 N.W.2d at 287; *Ouk*,

6. The dissent cites *Jones* to assert that a juvenile has no broad right to interrupt an interrogation. The dissent's reliance on *Jones* is misplaced because, as we said, in that case, the juvenile's request for a parent came only after the interrogation had ended, and in that case we refused to adopt a per se rule requiring police officers to provide a juvenile access to a parent before interrogation. 566 N.W.2d at 320–21, 324–25.

7. The dissent suggests that Burrell asked to speak with his mother *only* to "notify her of his whereabouts." But as we have indicated, Burrell's remarks to police officers suggest he also sought his mother's counsel. After being led into an interrogation room, Burrell asked an officer whether he could "talk to my mom before I get to talk to (inaudible)." Before being advised of his *Miranda* rights, Burrell remarked: "What * * * me being a juvenile interrogation, don't I get to um, can I call my mother cause (inaudible) supposed to be going (inaudible) * * * at 12 o'clock?"

8. Burrell does not challenge the district court's factual determinations that during interrogation he was not in physical distress, was provided water, visited the restroom, demonstrated understanding of the questions, appeared willing to talk for more than two and a half hours, was in the 11th grade, had a

516 N.W.2d at 184–85. The nature of the interrogation includes whether the police used deception or trickery in an attempt to secure a waiver and eventual confession. *State v. Thaggard,* 527 N.W.2d 804, 810 (Minn.1995). In *Miranda,* the Supreme Court criticized police use of trickery, threats, and cajolement to persuade a suspect to waive his Fifth Amendment rights. *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602. In *Thaggard,* we observed that while there is no per se rule that bans use of deceit during interrogation, police officers "proceed on thin ice and at their own risk when they use deception" to secure a confession. 527 N.W.2d at 810.

Burrell argues that the police officers who interrogated him lied when they stated that codefendants Tyson and Williams both had implicated him in the shooting. The state stops short of conceding that a lie occurred, but acknowledges that the interrogators mischaracterized some evidence that they had against Burrell at that time, *e.g.,* that Williams did not identify Burrell as the third person involved in the crime. Yet before Burrell was given his *Miranda* warning, the lead investigator told Burrell that the investigators had "talked with Hans *and* Ike," that *"they're* putting you in the middle of some stuff," that *"they're* hooking you into this stuff," and that Burrell needed to let the investigators know "if *those guys* are full of baloney or * * * if *they* hooked you into something you didn't want to be in." (Emphasis added.) A transcript of Williams' guilty-plea hearing, which Burrell has made part of the record on appeal, shows that Williams had testified under oath to not knowing the identity of the third person involved in the shooting. Also, at Burrell's pretrial hearing, it was suggested that Williams had told his attorney that Burrell was not involved in the shooting— a suggestion that Williams was required to recant as part of his guilty plea a month after Burrell's trial.

These circumstances strongly suggest that some mischaracterizations occurred before Burrell received his *Miranda* warning. Accordingly, we distinguish this situation from that in *Jones* where, in addition to no request for a parent until after the interrogation, it was undisputed that the denied access to a parent was the "only factor" supporting the argument that the juvenile's *Miranda* waiver was not knowing, intelligent, and voluntary. *Jones,* 566 N.W.2d at 325.

The state, which bears the burden of proving that Burrell's *Miranda* waiver was effective, maintains that it was reasonable to restrict Burrell's access to his mother and that any mischaracterizations made during interrogation were insufficient to invalidate Burrell's *Miranda* waiver. The state asserts that the waiver was knowing, intelligent, and voluntary because Burrell was "experienced in the criminal justice system and sophisticated enough to ask police whether, as a juvenile, he had a 'right' to contact his mother." However, the fact that Burrell asked for his mother three times before receiving a *Miranda* warning (and ten times afterward) suggests a lack of sophistication regarding his rights in general and the *Miranda* waiver in particular. Had Burrell received access to his mother, she might have advised him

---

son, and was not subjected to overly coercive questioning or "angry" exchanges. In addition, the record shows that Burrell had been advised of *Miranda* rights at least once before and had prior contacts with police. The record shows that Burrell's interrogators inquired about his age, education, and past contacts with police before advising him of his *Miranda* rights, but we take exception with the dissent's characterization that the officers took "painstaking" efforts to ensure Burrell's comprehension of his rights.

whether he should talk to an attorney before waiving his *Miranda* rights or to have an attorney present during questioning.[9]

■■■ As we have said, we subjectively analyze the totality of the circumstances to determine whether the district court committed clear error by ruling that the state has proven by a preponderance of the evidence that Burrell's *Miranda* waiver was knowing, intelligent, and voluntary. *See Ray,* 659 N.W.2d at 742; *Hannon* 636 N.W.2d at 806; *Camacho,* 561 N.W.2d at 168–69. Although we reiterate that there is no per se rule requiring a parent's presence before a juvenile waives his *Miranda* rights, the circumstances of this case suggest that Burrell's repeated requests for a parent were enough to render his *Miranda* waiver ineffective. When the requests are coupled with the pre-*Miranda* mischaracterization as to Williams implicating Burrell, we conclude that the police crossed the line when securing a waiver from this juvenile suspect, and that the state has not met its burden of proving that Burrell was unaffected by the denied access to his mother and the use of some mischaracterizations. Accordingly, we hold that the district court committed error by ruling that Burrell's *Miranda* waiver was knowing, intelligent, and voluntary.[10]

## II.

■■■ Having concluded that Burrell's *Miranda* waiver was ineffective, we must determine whether the district court's error in permitting the jury to view the videotape of the interrogation was harmless. When statements are erroneously admitted after a *Miranda* waiver has been found ineffective, a new trial is warranted unless the error is harmless beyond a reasonable doubt. *Hannon* 636 N.W.2d at 807. An error is harmless beyond a reasonable doubt only if the verdict was "surely unattributable" to the error. *Id.*

■■■ Here, we cannot ignore that during his interrogation, Burrell never confessed to shooting Tyesha, that he consistently maintained he was not involved, and that he repeatedly said that he did not associate with Tyson or Williams. We also acknowledge that Burrell did not object to the videotape's admission at trial and that the failure to object to a particular error generally bars appellate review unless substantial rights are at risk such that fair-trial rights are implicated. *State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002); *see also* Minn. R.Crim. P. 31.02. But Burrell did adequately challenge his *Miranda* waiver before and after trial. Under these circumstances, it would be unjust to foreclose Burrell from challenging the admission of a videotaped interrogation that vio-

---

9. The state maintains that because Burrell indicated during interrogation that his mother would provide him an alibi, it was necessary to keep the two sequestered. However, when Marketta Burrell arrived at the police station, the police officers could have halted her son's interrogation, interviewed her, and then allowed him access to his mother.

10. Burrell claims that several other circumstances contributed to the ineffectiveness of his waiver—e.g., that he was interrogated for a "significant time" before receiving his *Miranda* warning, that he waived his rights only after being "pressured and cajoled" into do-

ing so, that he was no more capable of waiving *Miranda* rights than any other juvenile, that police officers improperly claimed they were looking out for his "best interests," and that it was improper for police officers to pressure him to make a statement "so he could be there for his children." Because we conclude that Burrell's having been denied access to his mother and specific mischaracterizations made during interrogation are enough to render the *Miranda* waiver ineffective, we need not examine these other circumstances.

lates *Miranda* simply because he did not specifically object to its admission.

▇ In addition, by allowing the jurors to view the videotape, we believe Burrell's substantial rights were at risk. Recently, in *Bernhardt v. State,* 684 N.W.2d 465, 475–76 (Minn.2004), we held that admission of an interrogator's false statements—that the defendant's codefendants had implicated him in a murder—constituted plain error affecting substantial rights in part because the jury never was told that the statements were untrue. We distinguished the situation in *Bernhardt* from that in *State v. Tovar,* 605 N.W.2d 717 (Minn.2000), where an interrogator's exaggeration of his knowledge of facts regarding the crime "turned out to be true." *Bernhardt,* 684 N.W.2d at 475.

Because Burrell's codefendants did not testify at any trial, we cannot say whether their statements, as told by Burrell's interrogators on the videotape and heard by the jury, turned out to be true.[11] But the criminal complaint issued a day after Burrell's interrogation bolsters Burrell's contention that the videotaped interrogation resulted in putting uncorrected mischaracterizations before the jury. According to the complaint, Tyson maintained that although he, Burrell, and Williams were riding together on the day of the shooting and had had a "verbal exchange" with Oliver, they did not fire weapons. This does not support the post-*Miranda* suggestion that Tyson had "blamed" Burrell for the shooting. In addition, according to the complaint, Williams had observed Tyson return from the scene holding a gun. As we have said, there is evidence that Williams did not even know Burrell.

▇ The district court denied Burrell's request to cross-examine the officers about specific false statements they made during interrogation. The court did so out of concern for "opening the door" to scrutiny of what the codefendants said or did not say.[12] Yet, instead of instructing the jurors before the videotape was played that the police officers' comments were not to be used to determine Burrell's guilt or innocence, the court waited until the end of the trial to do so and then did so as part of the general jury instructions. The better practice to take is the prophylactic measure taken in *State v. Ferguson,* 581 N.W.2d 824, 835 (Minn.1998) *reh'g denied* (Minn. Aug. 3, 1998), when a transcript of an interrogation in which police accused the suspect of lying was read only after the court warned the jury that the officer's questions were not evidence to be considered in reaching a verdict.

The bottom line here is that as a direct result of viewing Burrell's videotaped interrogation taken in violation of *Miranda,* the jurors may well have gone to the jury room believing that both Tyson and Williams had identified Burrell by name as being involved, and that Tyson had "blamed" Burrell for the shooting. Besides the videotape, the state's case largely

---

11. In *Tovar,* by contrast, a police interrogator testified on cross-examination as to specific misstatements he had made—that while he had said a person on a store videotape "looked like" the defendant, the officer had not in fact viewed the videotape at that time. 605 N.W.2d at 725.

12. It appears from the record that the court was generally concerned that if Burrell were allowed to specify that at the time of interrogation neither Tyson nor Williams had identified Burrell by name, the door would be opened for the state to offer evidence of any subsequent conflicting testimony, which would have been a probable violation of Burrell's constitutional right to confront witnesses against him because the codefendants did not testify at Burrell's trial. U.S. Const. amend. VI; *see also Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

rested on testimony from Oliver, a potential rival gang member who said that "Little Skits" was the shooter; a jailhouse statement by Burrell as recalled by Burrell's cousin, but in which Burrell nevertheless denied being involved; testimony from a jail inmate who purportedly heard Burrell confess and whose credibility was improperly bolstered by a forensic psychologist [13] (*see* Part IV, *infra*); and eyewitness testimony that someone with physical characteristics similar to Burrell ran from the scene. This evidence is not so overwhelming that we can unequivocally say that "a reasonable jury would have arrived at the verdict without the prejudicial evidence." *Hannon* 636 N.W.2d at 807. For these reasons, we conclude that the error of admitting the videotape is not harmless beyond a reasonable doubt because the verdict rendered was "surely unattributable" to the error. *See id.* Accordingly, we hold Burrell is entitled to a new trial at which his videotaped interrogation is not to be shown to the trier of fact.

Because we conclude that the videotape of Burrell's interrogation is barred from use in any subsequent prosecution, we need not further address Burrell's argument that the district court committed error by refusing to allow cross-examination on specific false statements that police investigators made regarding what Tyson and Williams said about Burrell's involvement in the crime.

### III.

 Burrell also argues that his constitutional right to confront all witnesses against him was violated when the district court admitted hearsay testimony from his mother, Marketta Burrell.[14] The question of whether hearsay testimony violates a defendant's Confrontation Clause rights is one of law and fact; therefore, de novo review is proper. *State v. King*, 622 N.W.2d 800, 806 (Minn.2001).

The Sixth Amendment to the United States Constitution ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI. After Burrell's conviction, but while his direct appeal was pending, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which has altered how courts have interpreted the Sixth Amendment.

In *Crawford*, the Court held that "testimonial" hearsay evidence is inadmissible unless the now unavailable declarant was previously available for cross-examination. *Id.* at 68, 124 S.Ct. 1354. The declarant in *Crawford*—a suspect—was advised of her *Miranda* rights and then interrogated about roles that she and her husband may have played in an attempted murder. *Id.* at 38–40, 124 S.Ct. 1354. Washington's marital privilege law barred the declarant from testifying in court at her husband's trial, but the court admitted her prior statement, which cast doubt on her husband's self-defense claim. *Id.* at 39–40, 124 S.Ct. 1354. The Court held that admitting the declarant's prior testimonial

---

**13.** The dissent suggests that we have given insufficient weight to Oliver's testimony about seeing Burrell in the area from where the shots were fired. We disagree. Oliver's testimony is a mixture of direct and circumstantial evidence, and it is not clear whether Oliver actually identified Burrell or "Little Skits" as firing a live round that could have killed Tyesha. Without more, the importance of Oliver's testimony should not be overstated.

**14.** The record indicates that Marketta Burrell died in a motor vehicle accident on her way home to Bemidji after visiting her son at the Hennepin County Jail.

statement when the defendant had no opportunity to cross-examine the declarant violated the Sixth Amendment's Confrontation Clause. *Id.* at 68, 124 S.Ct. 1354.

The Supreme Court limited its holding in *Crawford* to "testimonial" hearsay evidence. *Id.* Although the Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial[,]'" it expressly held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." *Id.* The Court advised that "interrogation" is to be used "in its colloquial, rather than any technical legal, sense," and includes under any definition a "statement[ ] knowingly given in response to structured police questioning * * *." *Id.* at 53 n. 4, 124 S.Ct. 1354.

In this situation, it appears that Marketta Burrell voluntarily came to the police station to inquire about the circumstances of her son's arrest. It also appears that she willingly went to a police interrogation room. Apparently her exchange with the police was recorded electronically, but neither a recording nor a transcript of the exchange was made part of the record. Unlike the declarant in *Crawford,* she was not in custody, not a suspect, and was not advised of her *Miranda* rights. Further, the record before us is relatively undeveloped with respect to the facts and circumstances of her meeting with the police. This is not surprising given that *Crawford* was decided after Burrell's trial. In any case, the existing record is insufficient for us to make an informed decision whether Marketta Burrell's statements are testimonial within the meaning of *Crawford.* Thus, we are unable at this time to determine whether her comments are admissible hearsay under *Crawford,* i.e., were not made in response to "structured police questioning." Accordingly, on remand the district court should receive foundational evidence regarding Marketta Burrell's statement and then weigh all relevant factors as it determines whether the state has proven that the statement may be admitted consistent with the Sixth Amendment and *Crawford. See King,* 622 N.W.2d at 807 (placing on the state the burden of proving that hearsay statement does not violate defendant's Sixth Amendment rights).

## IV.

■■■■■ Burrell's next argument is that the court erred by admitting expert vouching testimony from forensic psychiatrist Karen Bruggemeyer. Bruggemeyer testified at trial that Burrell's fellow inmate James Turner, who suffered from mental illness, was being "truthful" when he testified that he heard Burrell confess to committing the shooting. We review evidentiary rulings for abuse of discretion. *State v. Bailey,* 677 N.W.2d 380, 395 (Minn. 2004).

■■■■■ The Minnesota Rules of Evidence permit any witness with "scientific, technical, or other specialized knowledge" to be qualified as an expert and give testimony that assists the trier of fact in understanding evidence or determining a fact in issue. Minn. R. Evid. 702. However, we have repeatedly stated that in criminal trials expert testimony must be monitored carefully to ensure that the jury is the sole determiner of a witness's credibility. *See, e.g., State v. DeShay,* 669 N.W.2d 878, 885 (Minn.2003); *State v. Nystrom,* 596 N.W.2d 256, 259–60 (Minn.1999); *State v. Grecinger,* 569 N.W.2d 189, 193 (Minn. 1997). Generally, expert opinions about whether a witness is testifying falsely or from fantasy are excluded. *State v. Myers,* 359 N.W.2d 604, 611 (Minn.1984);

*State v. Saldana*, 324 N.W.2d 227, 231 (Minn.1982).

When Burrell cross-examined Bruggemeyer, our reading of the record is that he was not attacking Turner's character for truthfulness. By asking whether Turner was "capable of" confusing what he heard in jail, Burrell was questioning Turner's *competency* to testify—an inquiry relevant to Burrell's defense. Minn. R. Evid. 402. Yet, in response to a question from the state, Bruggemeyer offered her opinion on Turner's truthfulness. Her response was improper because competence to testify is to be distinguished from a witness's credibility. Whether a witness is "being truthful" is within the province of the jury. Minn. R. Evid. 608(a). In addition, Bruggemeyer's response was prejudicial because, as expert opinion, it likely deprived the jury of the ability to gauge for themselves Turner's truthfulness. *DeShay*, 669 N.W.2d at 888.

■ When the state asked Bruggemeyer whether she believed Turner had "made up" anything he told police, even a "yes" or "no" answer would have been inadmissible vouching testimony. Therefore, the district court should have anticipated Bruggemeyer's response and sustained the objection Burrell made after the question was asked, but before the answer was given. We realize it is difficult, often impossible, and sometimes imprudent for a court to anticipate and prevent every inadmissible response. Further, we acknowledge that Burrell did not renew his objection after Bruggemeyer gave her answer. Yet, in a criminal trial, a court has a heightened duty to monitor expert testimony. *See DeShay*, 669 N.W.2d at 885, 888. In this situation, close monitoring did not occur and inadmissible testimony was given. Therefore, we hold that the court abused its discretion when it failed to sustain Burrell's objection to the state's question of Bruggemeyer and in not directing the jury to disregard Bruggemeyer's response.

## V.

■ Next, we must address the appropriateness of expert testimony from a Minnesota Gang Strike Force officer, who testified about Minneapolis gangs, Burrell's purported gang affiliation, and the 10–point criteria Minnesota police use to determine gang affiliation. Admission of expert testimony falls within the district court's broad discretion. *Litzau*, 650 N.W.2d at 185.

Burrell argues that the gang-affiliation testimony was neither necessary nor helpful, unduly gave credence to Oliver's testimony, and suggested that Burrell's "mere association" with gang members made him guilty. Burrell relies largely on *DeShay* and *State v. Lopez–Rios*, 669 N.W.2d 603 (Minn.2003), cases we decided after Burrell's trial but while Burrell's case was pending on direct appeal. In *DeShay* and *Lopez–Rios*, we cautioned against expert gang testimony that is duplicative, based on hearsay testimony, more prejudicial than probative, and conclusory about a defendant's gang affiliation. We directed that expert gang testimony should be weighed "preferably outside the presence of the jury" to ensure that it goes toward a fact in issue. *DeShay*, 669 N.W.2d at 887–88. We also questioned the "helpfulness" of the gang criteria and warned that expert testimony about a defendant's gang membership "comes close to, although not completely within, the exclusion of expert opinion as to the mental state of a defendant constituting an element of the charged crime." *Id.* at 886–87 nn. 7–8; *Lopez–Rios*, 669 N.W.2d at 612–13.

Much of the officer's testimony was precisely the type of testimony we criticized in *DeShay* and *Lopez–Rios*. Nevertheless,

we realize the district court did not have the benefit of those two decisions during Burrell's trial. Accordingly, on remand we direct the court to weigh our directives in *DeShay* and *Lopez–Rios* carefully as it exercises discretion over what expert gang testimony is admitted.

## VI.

Next, we must examine whether the district court erred in refusing to allow testimony from jail inmates and a jail visitor who purportedly heard Tyson admit that he was the shooter and that Burrell was not involved in Tyesha's shooting. Evidentiary rulings on hearsay statements against penal interest are reviewed for clear abuse of discretion. *State v. Henderson*, 620 N.W.2d 688, 696 (Minn. 2001). When a hearsay statement against penal interest is offered to show an alternative perpetrator or to exculpate the accused, corroborating circumstances must clearly indicate its trustworthiness. Minn. R. Evid. 804(b)(3). However, to ensure due process, a hearsay rule "may not be applied mechanistically" to exclude evidence of an alternative perpetrator. *Chambers v. Mississippi*, 410 U.S. 284, 298, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

In this situation, the proffered statements are hearsay because they were uttered outside of court. Minn. R. Evid. 801(c). The district court properly required Burrell to prove "sufficient indicia of reliability" before admitting the statements against penal interest. The court was correct when it concluded in its Omnibus Order before trial that "[t]he fact that a statement is alleged to have been made contrary to the penal interest of a nonparty does not by itself provide indicia of reliability." Before trial, Burrell provided a notice of potential witnesses that included several persons who were in the Henne-

pin County jail with Tyson as well as someone who had spoken with Tyson before he was arrested. Burrell's notice suggested that each witness would testify to a conversation or conversations in which Tyson said that Burrell was not present at the shooting and/or that Tyson fired the shots. Burrell's notice included no information about the circumstances of the conversations. Burrell referenced a letter from one of the inmates that supposedly sets out details of the proposed testimony, but the record contains no such letter. The record does contain letters that appear to be from two of the inmates Burrell wanted to testify, but these letters are difficult to read, do not contain a clear description of any statements by Tyson, and at most describe a statement that "the seventeen year old had nothing to do with it * * *."

Burrell argues that the sheer number of witnesses and the similarity of their statements demonstrate trustworthiness. Before trial, he argued the fact that the witnesses "are not getting anything for" testifying provided the needed reliability, but the district court nevertheless excluded the testimony. We agree that Burrell did not meet his burden of providing an adequate offer of proof to show that his proffered witnesses would meet the reliability requirement, i.e., that they could establish the necessary foundation for their testimony. Although the sheer number of witnesses would appear to provide reliability and corroboration if an adequate offer of proof had been made, Burrell's failure to make an adequate offer substantiates the court's conclusion that reliability had not been shown.

Burrell was free to prove reliability at any time during trial, but the district court concluded he failed to do so. Here, the court did not apply hearsay rules "mechanistically" in violation of due process or

clearly abuse its discretion in excluding testimony from persons who purportedly heard Tyson admitting to being the shooter and exonerating Burrell. Therefore, we hold that the court did not err when it refused to allow testimony from jail inmates and a jail visitor who purportedly heard Tyson make comments that exculpated Burrell.

## VII.

 Burrell's next argument is that the district court erred by refusing to compel discovery of the state's plea negotiations with codefendants Tyson and Williams amid indications that the state may have pressured these codefendants to not testify on Burrell's behalf. District courts have wide discretion on discovery rulings. *State v. Davis*, 592 N.W.2d 457, 459 (Minn.1999). However, if a criminal defendant's due process rights are violated because the state has suppressed evidence material to guilt or innocence that is favorable to the accused, a new trial is warranted. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 152, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn.1992).

Tyson pleaded guilty two months before Burrell's trial.[15] Burrell suspects a *Brady* violation occurred during the plea negotiation because the state reserved the right to rescind Tyson's plea if Tyson ever testified contrary to what he said at his plea hearing. Williams pleaded guilty a month after Burrell's trial. Burrell criticizes the state for requiring Williams to disclaim at Williams' guilty plea hearing, which was held after Burrell's trial, any prior statements that Burrell was not involved in the shooting and testify instead that Williams did not know the identity of the third person in the car.

Concerned by what he regarded to be the unusual circumstances of the plea agreements and in an attempt to safeguard his due process rights, Burrell attempted through discovery to obtain the details of the state's plea negotiations with Tyson and Williams. The district court refused to compel discovery stating that doing so would have violated the attorney-client privilege and because plea negotiations are inadmissible under the Minnesota Rules of Evidence.

 While we share concerns for making plea negotiations public, we conclude that the district court erred in its analysis. Although attorney-client privilege may attach to communications between the codefendants and their attorneys, no such privilege existed between codefendants and the state, even though the attorneys may have had a duty to keep the negotiations confidential. *State v.*

15. Burrell made the transcript of Tyson's plea hearing part of the record on appeal. The transcript reveals that Tyson said Oliver was among Gangster Disciples who had previously robbed and pointed guns at Williams. Tyson admitted that he, Williams, and Burrell were riding together in Williams' car on Chicago Avenue South on November 22, 2002, when Williams recognized Oliver. According to Tyson, Oliver ran toward the car, "acting like he was pulling out a gun." Tyson said that he, Williams, and Burrell drove away and discussed their response. Tyson testified that "Burrell said, let's get him or something like that." Tyson stated that he, Williams, and Burrell then planned to return to the 3400 block of Chicago Avenue South to shoot Oliver. Tyson said that Burrell had a .40–caliber gun and that Tyson picked up a gun before the three returned to where they had seen Oliver. They parked Williams' car one block over from Chicago so that it could not be identified. Tyson said that he and Burrell, both carrying guns, walked through an alley and some yards and then spotted Oliver in front of a house mid-block. Tyson said that he did not fire his gun, but that Burrell did fire seven to nine shots toward Oliver.

*Blom,* 682 N.W.2d 578, 620 (Minn.2004).[16] In addition, the court erred by applying the Rules of Evidence instead of the Rules of Criminal Procedure to Burrell's discovery request. An accused in Minnesota receives access to "all matters within the prosecuting attorney's possession or control which relate to the case," and specifically any evidence "that tends to negate or reduce the guilt of the accused." Minn. R.Crim. P. 9.01, subd. 1, subd. 1(6). Minnesota's criminal discovery rule is broader than what many states and the federal courts require. *Kaiser,* 486 N.W.2d at 386. Therefore, it is premature for a court to presume that whatever a criminal defendant secures in discovery invariably will be offered as evidence. *See, e.g.,* Minn. R. Civ. P. 26.02(a) (discoverable material "need not be admissible at the trial").

 Confidential plea negotiations "foster meaningful dialogue between the parties and * * * promote the disposition of criminal cases by compromise." *Blom,* 682 N.W.2d at 620. Yet, as we have said, criminal defendants enjoy wide latitude in requesting and receiving discovery, and

district courts are afforded broad discretion to make discovery rulings. Superior to discovery procedures, however, is the court's duty under *Brady* to ensure that a defendant's prosecution proceeds consistent with due process. For these reasons, we conclude that Burrell's inquiry is best characterized not as a discovery request, but as an invocation of his due process rights.

The Supreme Court has endorsed *in camera* review when the public's interest in keeping documents confidential must be balanced against due process rights. *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).[17] We have ordered *in camera* review in several circumstances when confidentiality was a chief concern.[18] For instance, in *State v. Paradee,* which involved a criminal defendant's request for confidential medical records, we held that *in camera* review was preferable to an "approach which in effect allows defense counsel easy access to various types of privileged and confidential records simply by asserting that the records might contain material relevant to the

---

**16.** In *Blom,* we noted that a criminal defendant may negate the confidentiality of plea negotiations, such as by directing his attorney to speak with the news media about plea negotiations. 682 N.W.2d at 620.

**17.** In *Ritchie,* a defendant charged with sexually abusing his minor daughter sought discovery of records retained by a Pennsylvania agency charged with investigating child mistreatment and neglect. The Court noted: "Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. * * * An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations." *Ritchie,* 480 U.S. at 57, 61, 107 S.Ct. 989.

**18.** *See In re Rahr Malting Co.,* 632 N.W.2d 572, 577 (Minn.2001) (whether Tax Court hearing should be closed to protect trade secrets); *State v. Turner,* 550 N.W.2d 622, 629 (Minn.1996) (whether newspaper retained unpublished photographs relevant to a criminal defense); *State v. Logan,* 535 N.W.2d 320, 325 (Minn.1995) (whether Bureau of Alcohol, Tobacco and Firearms records contained impeachment evidence); *Erickson v. MacArthur,* 414 N.W.2d 406, 409–10 (Minn.1987) (whether police department's internal affairs files were proper for civil discovery); *Syrovatka v. State,* 278 N.W.2d 558, 562 (Minn.1979) (whether confidential informant's testimony was necessary for a fair trial). *See also Anderson v. United States,* 788 F.2d 517, 519–20 (8th Cir.1986) (ordering *in camera* review when faced with insufficient *Brady* disclosure).

defense." 403 N.W.2d 640, 642 (Minn. 1987).

■ A defendant requesting *in camera* review must make at least some "plausible showing" that the information sought would be material and favorable to his defense. *State v. Hummel,* 483 N.W.2d 68, 72 (Minn.1992) (denying *in camera* review because defendant provided "no theories on how the [confidential medical] file could be related to the defense or why the file was reasonably likely to contain information related to the case"). *See also* Minn. R.Crim. P. 9.03, subd. 6 (stating procedure for *in camera* review of discovery material). Here, we acknowledge that it is a close call whether Burrell has made a "plausible showing" that would trigger *in camera* review. We also acknowledge that Burrell could be engaging in a proverbial fishing expedition and that the state may have nothing of use to him. In addition, we note that while Tyson pleaded guilty before Burrell's trial, Williams pleaded guilty afterward, so scrutinizing the state's offer to Williams may be especially problematic.

Nevertheless, we share Burrell's concern about the circumstances of the two plea agreements—Tyson's in particular. It appears that the state conditioned Tyson's plea on his agreeing *not to testify* about prior contradictory statements he had made about whether Burrell was the shooter and whether Oliver was the intended target. Typically, pleas are conditioned on a codefendant agreeing *to testify,* not to keep quiet. Had Tyson taken the stand, the state could have impeached him if he gave conflicting testimony.

■ Any testimony that would exonerate Burrell is undeniably material to his defense. *State v. Gates,* 615 N.W.2d 331, 339 (Minn.2000) (stating that evidence is material if there is a reasonable probability that disclosure would yield a different result). Moreover, an *in camera* review of the circumstances surrounding the pleas would sufficiently balance the state's interest in confidentiality against Burrell's interests under *Brady.* We conclude that to ensure Burrell's due process rights under *Brady,* the court should have performed an *in camera* review of circumstances surrounding the codefendants' plea negotiations to ascertain whether the state, through its plea agreements, suppressed evidence material to Burrell's guilt or innocence and favorable to his case. We hold that the district court erred when it did not take affirmative steps when Burrell requested discovery surrounding plea negotiations that plausibly violated *Brady.*

At this point, a final comment is in order. The facts of this case are tragic. That an 11–year–old girl can be killed by a stray bullet while doing homework in the safety of her own home is disturbing and difficult to comprehend. Any life lost to gang warfare, regardless of whether the person killed was an intended victim, is one life too many. Nevertheless, it is fundamental that any criminal defendant, regardless of circumstances surrounding his alleged crime and regardless of any alleged gang affiliation, has a constitutional right to a fair trial. Here, we conclude that because of multiple errors, Burrell did not receive a fair trial and that he is entitled to a new trial. Because we remand for a new trial, we need not address Burrell's challenge to his sentence.

Reversed and remanded.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

HANSON, Justice (concurring and dissenting).

Although I agree with the conclusion of the majority that some errors were made

in Burrell's trial, I do not agree that any error has been shown to be so prejudicial as to warrant a new trial. I would conclude that: (1) the admission of the videotape of Burrell's interrogation was not error because Burrell voluntarily waived his *Miranda* rights and, even if the admission was error, it was harmless because Burrell's statements were exculpatory; (2) to the extent that Dr. Bruggemeyer's expert testimony included vouching for the testimony of James Turner, any error was harmless; (3) to the extent that expert testimony about criminal gangs was overboard and conclusory, any error was harmless; (4) a remand to the district court to conduct a hearing on whether Marketta Burrell's statements were "testimonial" is the appropriate remedy for Burrell's *Crawford* claim; and (5) a remand for an *in camera* review of the Tyson and Williams plea negotiations is the appropriate remedy for Burrell's *Brady* claims.

### 1. Videotape of Burrell's Interrogation

At the pretrial hearing on Burrell's motion to suppress the videotaped interrogation, Burrell relied on the argument that his *Miranda* waiver was ineffective because he was denied access to his mother. On appeal, Burrell expands his challenge to the videotaped interrogation by also arguing that investigators mischaracterized statements that had been made by Burrell's codefendants about Burrell's involvement in the murder, investigators failed to advise Burrell that any statements he made could be used in adult court, and investigators delayed giving the *Miranda* warning. I would conclude that Burrell waived these additional grounds by not including them in his motion to suppress. *See, e.g., State v. Roby,* 463 N.W.2d 506, 508 (Minn.1990). But even if we were to consider all grounds argued on appeal, as does the majority opinion, I would conclude that the totality of the circumstances

demonstrate that Burrell's waiver of his *Miranda* rights and his statements to police were made knowingly, intelligently and voluntarily.

### a. Denial of access to mother

The repeated references in the majority opinion to the number of times Burrell asked to speak to his mother implies that police should have honored that request. But we have held that a juvenile does not have a right to interrupt interrogation to speak to a parent and that interrogation must cease only when a juvenile unambiguously invokes the right to speak with counsel or the right to remain silent. *See, e.g., State v. Jones,* 566 N.W.2d 317, 323–24 (Minn.1997). Although Burrell asked to speak to his mother three times before the *Miranda* warning was given, he appears to have done so in the context of wishing to notify her of his whereabouts. He did not say that he wanted to speak to her about his right to counsel or to remain silent, and he did not condition his waiver of his *Miranda* rights on consultation with his mother. Burrell's requests cannot reasonably be interpreted as a request to consult with counsel or to remain silent, neither of which were ever mentioned.

These requests to talk to his mother can be considered as one factor in a totality of the circumstances analysis, but under the circumstances of this record and the way in which the requests were made, I would not give them significant weight. And I would give no weight to the additional requests that Burrell made after he waived his *Miranda* rights, particularly those that came after police had begun interviewing Burrell's mother separately.

### b. Mischaracterizations by interrogators

I agree with the conclusion reached by the majority that investigators mischarac-

terized information they had from Tyson and Williams when they said "they're putting you in the middle of some stuff" and "they're hooking you into this stuff." But the investigators' statements and suggestive questions were general, they did not suggest precisely how Burrell was said to have been involved, and any mischaracterization was slight. We have said that investigators may use mischaracterizations without rendering the resulting statements involuntary unless the "deceit is the kind that would make an innocent person confess." *Jones,* 566 N.W.2d at 326. The statements by the investigators were part of the preliminary explanation about why Burrell had been brought in for interrogation. The videotape reveals that they were made in a cordial manner, were not coercive and were not designed to overcome Burrell's will. In fact, the statements did not overcome Burrell's will because he did not confess. Accordingly, I would not give the investigators' mischaracterizations any significant weight in the analysis of the totality of the circumstances.

#### c. Possibility of prosecution as an adult

I agree with the conclusion of the majority that the failure of the investigators to inform Burrell that he could be prosecuted as an adult and that any statements that he made could be used in adult court, did not materially affect the validity of Burrell's waiver of his *Miranda* rights. Under the circumstances of the interrogation, it is fair to impute to Burrell knowledge of the possibility that he could be prosecuted in adult court.

#### d. Delay in providing a Miranda warning

The investigators did not give Burrell the *Miranda* warning until about 10 minutes after they began talking to him in the interrogation room. Although the majority does not find it necessary to consider this circumstance, I would conclude that it did not taint the interrogation. We have criticized a process where the investigators seek to obtain inculpating statements before giving the *Miranda* warning, and then to have the suspect repeat those statements after giving the warning. *State v. Bailey,* 677 N.W.2d 380, 390 (Minn.2004), *rehearing denied* (Minn. Apr. 22, 2004). Recently, in *Missouri v. Seibert,* the United States Supreme Court likewise condemned any deliberate attempt to make an "end run" around *Miranda.* 542 U.S. 600, 124 S.Ct. 2601, 2606–07, 159 L.Ed.2d 643 (2004). The circumstances here do not present the concerns raised in *Bailey* and *Seibert* because the investigators did not ask Burrell any questions about the shooting during the pre-*Miranda* segment. They only used this time for preliminary matters, such as to explain why they wanted to question Burrell. They actually tried to prevent him from making any statements about the shooting until after the *Miranda* warning was given. The investigators were undoubtedly trying to put Burrell at ease and to encourage him to talk. These are appropriate law enforcement goals and they did not violate Burrell's constitutional rights.

#### e. Totality of the circumstances

I disagree slightly with the majority's statement of the standard of review. The majority opinion states that we "make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was valid" and later that "we subjectively analyze the totality of the circumstances to determine whether the district court committed clear error by ruling that the state has proven by a preponderance of the evidence that Burrell's

*Miranda* waiver was knowing, intelligent, and voluntary." (pp. 17 and 27–28.) These statements are drawn from *State v. Camacho,* 561 N.W.2d 160, 168–69 (Minn.1997), but there the court appears to have conflated the review of the district court's fact-findings and conclusions of law into one test (stating that "the district court's *conclusion* that a waiver was knowing, voluntary and intelligent will normally not be reversed unless that *finding* is clearly erroneous.") (Emphasis added.) The better statement is that contained in *Jones,* that

> we will not reverse the trial court's specific findings unless they are clearly erroneous, but we will make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent and voluntary.

566 N.W.2d at 324. In *Jones,* we gave some deference to the district court's findings. The majority's analysis gives no deference to district court's findings.

At the omnibus hearing, the district court heard testimony from two of the interrogating officers and viewed the entire videotape of Burrell's interrogation. The lead investigator explained that he did not accede to Burrell's request to talk to his mother because it became apparent that Burrell intended to use his mother as an alibi witness and it would go against good police practice to interview two fact witnesses together or to allow them to speak freely to each other before giving a statement. The investigator also testified that he fully explained to Burrell why police wanted to speak to him and he gave an extensive *Miranda* warning and asked questions to test Burrell's comprehension of that warning.

Another investigator testified about the arrival of Burrell's mother at the station, that investigator's conversation with her,

and the subsequent interrogation of Burrell based on information obtained from his mother. The investigators testified about Burrell's demeanor during their respective interrogations, stating that he was alert, focused, relaxed, responsive, not unduly nervous, not angry, and not intoxicated or otherwise disabled. Both testified that no threats were made and no coercion was used. The second investigator testified that when he disagreed with Burrell or confronted him with a conflict with his mother's statement, Burrell stood his ground. A review of the videotape confirms that the investigators' firsthand observations are accurate.

The lead investigator also testified about his knowledge of Burrell's previous contacts with law enforcement, which included several contacts with Minneapolis police, four arrests and at least one prior *Miranda* warning.

The district court made detailed findings. The court determined that no questions were asked of Burrell until after a full *Miranda* warning was given; that Burrell demonstrated his knowledge and understanding of the *Miranda* rights "by repeating a number of the rights in his own language"; that Burrell demonstrated that he "accurately understood what rights were involved"; that Burrell demonstrated his understanding of the questions asked and his "willingness to speak to the officers"; that Burrell was provided with water, was allowed to use the restroom and was not restrained; that Burrell appeared to be comfortable and without physical distress; and that the questions were not overly coercive. The court found that Burrell "made a knowing, intelligent waiver of his rights" and that the "statements that he gave to the police were given freely and voluntarily."

I would conclude that the district court's findings are supported by the evidence,

are not clearly erroneous and support the conclusion under the totality of the circumstances that Burrell's waiver of his *Miranda* rights was intelligently and knowingly made and that his statements were voluntary. Even if no deference is given to the district court's findings and we were to review the evidence independently, I would likewise conclude that the evidence concerning Burrell's age, experience, education, background and intelligence demonstrated that he was fully capable of understanding, and did understand, the warnings about the nature of his rights and the consequence of waiving those rights. Given the comprehensive discussion with Burrell of the *Miranda* warning, the open and non-coercive nature of the interrogation, Burrell's frequent volunteering of information and ready responses to questions, the absence of any confessions by Burrell, the fact that his requests to speak with his mother did not suggest any unwillingness to continue the interrogation and did not invoke his right to counsel or to remain silent, and the fact that the mischaracterizations of evidence made by the interrogators in preliminary discussions were slight and did not appear to intimidate or otherwise influence Burrell, I would conclude that Burrell's statements were voluntary. Accordingly, I would rule that the videotape was admissible.

Even if the admission of the videotape was error, I would conclude that it was harmless. The tape does not contain any confessions. Burrell consistently denied any involvement with the shooting and even denied that he had been with Tyson and Williams. In fact, Burrell's failure to object to admission of the videotape suggests a deliberate trial strategy. The ad-

mission of the tape allowed Burrell to present his exculpating story to the jury without subjecting himself to cross-examination. Having chosen this strategy, Burrell cannot genuinely argue that the admission of the tape affected his substantial rights. *See State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002); Minn. R.Crim. P. 31.02.

The majority finds that Burrell's substantial rights were "at risk" because the investigator's mischaracterizations were presented to the jury. But those mischaracterizations were slight and nonspecific and the court instructed the jury that they were not evidence. Further, I disagree with the statement of the majority that we "cannot say whether [the codefendants'] statements * * * turned out to be true." Although Tyson and Williams did not testify to their eyewitness accounts, the intended victim, Oliver, did. When Oliver testified that Burrell was the shooter, he provided evidence that was far more specific, detailed and relevant than the investigator's generalized statements that Tyson and Williams were "putting [Burrell] in the middle of some stuff." [19]

The majority opinion understates the impact of Oliver's testimony in its harmless error analysis. It acknowledges that there was "testimony from Oliver, a potential rival gang member who said, 'Little Skits' was the shooter." (p. 31.) But Oliver went much further. He said that Burrell was "Little Skits," he identified Burrell as the shooter in a photo lineup, and, during his trial testimony, he identified Burrell as the person who was standing alone in the area where the shots had been fired and who pointed a gun at him and

**19.** The majority mentions a "post-*Miranda* suggestion that Tyson had 'blamed' Burrell for the shooting." To be completely accurate, the investigator did not say, pre-*Miranda*, that Tyson "blamed" Burrell for the shooting. Further, this is not an accurate description of what was said post-*Miranda*. Instead, the investigator only asked: "Is it wrong if Ike's blamed it on you?"

pulled the trigger. Thus the case against Burrell was not circumstantial, but was based on direct eyewitness testimony.

Oliver's testimony was corroborated by the physical evidence. The trajectory rod placed in the bullet hole in the wall of the home where Tyesha Edwards was shot, pointed to an area in the side yard across Chicago Avenue. Police found discharged cartridge casings in that yard, in the same general area where the trajectory rod from the bullet hole pointed. Oliver testified that he heard nine or ten shots coming from the location where the casings were found and, when the shots stopped, he saw Burrell standing alone in that yard pointing a gun at him and trying to fire it, but there were no more shells in the gun. Oliver testified that there was daylight and there were no obstructions to his view. He saw Burrell standing there alone with the gun in hand, aimed at Oliver. After the shooting, Oliver observed two holes in his pants that had not been there before the shots were fired. Oliver's testimony was also partially corroborated by admissions that Burrell made to his cousin and to James Turner.

The slight mischaracterizations by police in the videotape, which were presented to the jury without objection by Burrell, were insignificant in the face of Oliver's eyewitness testimony about Burrell's actions, as corroborated by the physical evidence and Burrell's own admission that he had been with Williams and Tyson when Edwards was shot.

### 2. Dr. Bruggemeyer's testimony

Dr. Bruggemeyer's statement that she believed that James Turner was "being truthful" was improper expert opinion, but was an isolated statement. Further, it was not responsive to the state's question and Burrell failed to move to strike the answer after it was given. In the context of Oliver's direct evidence identifying Burrell as the shooter, this "vouching" was harmless.

### 3. Gang expert's testimony

Although the Gang Strike Force officer's testimony about criminal gangs went beyond the guidelines we suggested in *DeShay* and *Lopez–Rios*, this trial took place before those decisions were filed. Moreover, each of those decisions held that similar gang testimony was harmless error. *See State v. DeShay*, 669 N.W.2d 878, 888 (Minn.2003); *State v. Lopez–Rios*, 669 N.W.2d 603, 613 (Minn.2003). I would reach the same conclusion here because the officer's testimony was no more prejudicial than that in *DeShay* and *Lopez–Rios*, and because Burrell admits that "there was ample other testimony indicating that the shooting was committed for the benefit of a gang."

ANDERSON, Russell A., J. (concurring and dissenting).

I join in the concurrence/dissent of Justice Hanson.